UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHINANO KENSHI CORPORATION, and SHINANO KENSHI CO., LTD., | Case No. <u>1:22-cv-3704</u> |
| Plaintiffs, | **COMPLAINT** |
| - against - | |
| HONEYWELL INTERNATIONAL INC., | <u>DEMAND FOR JURY TRIAL</u> |
| Defendant. | |

Shinano Kenshi Corporation and Shinano Kenshi Co., Ltd. (collectively, "Shinano") by and through their attorneys, Davis Wright Tremaine LLP, bring this Complaint against Defendant Honeywell International Inc. ("Honeywell"), and allege as follows:

<u>**INTRODUCTION**</u>

1.     Honeywell is a diversified technology and manufacturing Fortune 100 company, focusing on aerospace, building technologies, performance materials and technologies, and safety and productivity solutions.  Among its many product offerings, Honeywell is a leading global provider of personal protection equipment ("PPE").  The Honeywell brand dates back to 1906 and, as part of this long history, the company boasts that "[a]t Honeywell, we have a responsibility to conduct ourselves with the highest levels of integrity in everything we do."[1]  Honeywell has long had close ties to the U.S. government, with U.S. government sales comprising a significant portion of Honeywell's revenue.  Indeed, Honeywell regularly approaches or exceeds $4 billion in total sales to the U.S. government on an annual basis.[2]

2.     Shinano, also known as ASPINA, is a leader in both manufacturing and hardware and software development that primarily operates in drive systems and precision motors, industrial

---

[1] https://www.honeywell.com/us/en/company/integrity-and-compliance.
[2] https://investor.honeywell.com/static-files/0f826f8b-fb20-4adc-a1e0-a841597316f1.

solutions, and assistive technology sectors.  In 2017, Shinano entered into a Strategic Supplier Agreement ("SSA") with Honeywell to manufacture and produce the custom Shinano DRF-29312-033 blower (the "ASPINA Blower") for use in Honeywell's Powered Air Purifying Respirator ("PAPR") unit.  The PAPR unit is an individual breathing PPE device originally intended for use in pharmaceutical development, manufacturing, construction, and hospital laboratory settings. The ASPINA Blower is the essential operating part for the PAPR unit.

3.      At the outset of the COVID-19 pandemic, Honeywell proactively marketed the PAPR unit to the U.S. government as a unique solution to protect frontline workers during the pandemic.  Despite Honeywell previously considering the PAPR unit as a low-volume, niche product, with only 1,936 ASPINA Blowers ordered across 2018 and 2019, during the first few months of the pandemic Honeywell ordered 112,000 of these units on an expedited timeline, informing Shinano that Honeywell had the support of the then-President of the United States to supply these products and was meeting specific commitments made by the U.S. government.  In short, Honeywell demanded that Shinano exponentially increase the scale of its operations at the most difficult imaginable time during a pandemic when workers across the globe were scared to report to work and demanded that Shinano expedite those orders so that Honeywell could profit from the increased demands for the PAPR unit during the pandemic.

4.      After Shinano delivered 62,424 ASPINA Blower units, in August 2020, Honeywell began delaying acceptance of the remaining ASPINA Blower units in contravention of the parties' agreed-upon shipment schedule.  Honeywell did not terminate the purchase orders (nor could it, although Shinano agreed to one good faith reduction of 6,000 units) and instead simply attempted to extend the delivery timeline from the third and fourth quarters of 2020 to the first half of 2021. Finally, after months of continued assurances and excuses for failing to accept delivery, including

so-called balance sheet accommodations requested by Honeywell to push all deliveries into 2021, Honeywell constructively terminated the SSA in February 2021. Specifically, Honeywell informed Shinano that it would not accept delivery of or pay for the more than 35,000 completed custom units that Shinano was holding at Honeywell's request and would not pay for any portion of the 11,500 custom units in progress. Honeywell argued that Shinano should share in its losses on the PAPR unit production because (a) the government unexpectedly cancelled orders of the PAPR units and/or (b) Honeywell had planned on selling many of the units outside of the United States, but the Trump Administration had unexpectedly prohibited U.S. companies from selling and exporting COVID-19 related PPE abroad.

5.      Based on Honeywell's refusal to accept delivery and remit payment, Shinano is owed more than $2.9 million for the ASPINA Blower units that were custom produced at Honeywell's request. Shinano brings this lawsuit seeking recovery from Honeywell for breach of contract, breach of the implied covenant of good faith and fair dealing, for common law fraud, and for negligent misrepresentation.

## **THE PARTIES**

6.      Shinano Kenshi Corporation is a California corporation with a principal place of business located in Culver City, California.

7.      Shinano Kenshi Co., Ltd., is a Japanese Corporation with its principal place of business in Nagano, Japan.

8.      Honeywell is a Delaware corporation with its principal place of business in Charlotte, North Carolina.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. This Court has personal jurisdiction over Honeywell because Honeywell voluntarily submitted to the jurisdiction of this Court under the terms of the SSA. Specifically, the SSA provides that "the federal or state courts in New York, New York will have exclusive jurisdiction of any dispute." SSA § 24.3.

11. Venue is also proper in this District because Honeywell agreed that a federal court in New York, New York, could hear any dispute arising under the SSA.

## FACTUAL ALLEGATIONS

**Honeywell's Powered Air Purifying Respirator**

12. Honeywell is a multinational conglomerate corporation that principally operates in four areas of business: aerospace, building technologies, performance materials and technologies, and safety and productivity solutions.[3]

13. Included among the products Honeywell offers for safety and productivity solutions is the PAPR.[4]

14. A PAPR is an air-purifying respirator that uses a blower to force air through filter cartridges or canisters and into the breathing zone of the wearer. This process creates an air flow inside either a tight-fitting facepiece or loose-fitting hood or helmet, providing greater protection

---

[3] https://www.honeywell.com/us/en/company/about-us.
[4] https://sps.honeywell.com/us/en/products/safety/respiratory-protection/powered-air-purifying-respirators-papr.

than the reusable elastomeric non-powered air-purifying half facepiece (half mask) or N95 FFRs.



15.     Because of their benefits, PAPRs are frequently used by healthcare practitioners to avoid exposure to pathogens, airborne particulates, or harmful contaminants.

16.     A PAPR system consist of several components, including a full-face mask or hood, a motor blower fan, a particulate filter, and a battery pack.

**The Strategic Supplier Agreement**

17.     In October 2017, Shinano entered into the SSA with Honeywell to manufacture and develop the ASPINA Blower as the essential motor blower fan in Honeywell's PAPR unit. Attached as **Exhibit A** is a true and correct copy of the October 2017 SSA.




*Honeywell's PAPR Unit*               *ASPINA Blower within PAPR Unit*

18.     The SSA was for a three-year period beginning October 2017 and was to automatically renew for additional one-year terms unless terminated by either party.  SSA § 2.1.

19.     Shinano custom manufactured and developed the ASPINA Blower to be the key component (*i.e.*, the motor blower fan) in Honeywell's PAPR unit.  In 2018 and 2019, Shinano sold a total of 1,936 ASPINA Blower units to Honeywell for use in Honeywell's PAPR units. Honeywell's demand for the ASPINA Blower was small, such that Shinano was not anticipating an exponential increase in that demand in 2020.

20.     The SSA provided that Honeywell was required to place orders for the ASPINA Blower via individual purchase orders and that such orders were subject to the terms of the SSA. SSA § 3.1.  It further provided that "[a]ny terms specific to such purchases different from those contained in this Agreement will be evidenced by a separate mutually agreed writing which references this Agreement."  *Id.*

21.     "Each Purchase Order will be deemed immediately accepted and binding upon [Shinano], unless it required delivery of Products in less than the Lead Time (as defined in section 6.1), or if the delivery quantity exceeds the Minimum Stocking Level, in which case [Shinano] may reject such Purchase Order within 2 business days of receipt."  SSA § 3.2.

22.     Pursuant to § 2.3 of the SSA, Honeywell "may terminate this Agreement for convenience upon 30 days' prior written notice.  Honeywell may terminate any Purchase Order without liability on the part of Honeywell upon 30 days' prior written notice."

23.     In the event Honeywell terminated the Agreement, § 2.4 to the SSA provided that:

> Honeywell's sole liability to [Shinano] and [Shinano's] sole and exclusive remedy, is payment for (A) Products received and accepted by Honeywell before the date of termination, and (B) with respect to custom Products that are within lead time under the terminated Purchase Order(s), unique raw materials, work in

progress and finished Products, which shall be delivered to Honeywell.

24. The SSA provided for a Lead Time of five days for a given purchase order so long as the Purchase Order was for a minimum of 400 up to a maximum of 800 ASPINA Blower units. SSA § 6.1, Ex. A.

25. The SSA also provided for a 60-day replenishment lead time for Shinano to replenish its inventory of ASPINA Blower units. SSA § 6.1, Ex. A.

26. The SSA provided that "TIME IS OF THE ESSENCE" for Honeywell's purchase of ASPINA Blower units and that Shinano was required to "maintain an on-time delivery performance of 100%." SSA § 12.1.

27. Pursuant to § 24.3 of the SSA, the "construction, interpretation, performance, and enforcement of this Agreement … or any related claims whether founded in contract, tort, or otherwise, will be governed by the laws of the State of New York, U.S.A. without regard to or application of its principles or laws regarding conflicts of laws."

**COVID-19 Purchase Orders**

28. In March 2020, the COVID-19 pandemic resulted in mass stay-at-home orders such that businesses across the United States shut down, both voluntarily and based on government orders requiring closure of non-essential businesses.

29. As the government and businesses sought ways to operate during the pandemic, Honeywell began leveraging its safety and productivity solutions in providing PPE to frontline workers and businesses. This included Honeywell planning to increase production of N95 masks and PAPR units, among other items, and selling them to the U.S. government at very profitable margins.

30.     To increase its production of PAPR units, Honeywell demanded that Shinano dramatically increase its production of the ASPINA Blower units.  On March 23, 2020, Michael Benson, Honeywell's Senior Director, Strategic Sourcing, informed Shinano that it was "responding to our U.S. Government's request to ramp up our Honeywell Mexicali production of our PAPR product line to 5,000 to 10,00 [sic] units per month and further explore the ability to go to 15,000 to 20,000 units per month.  Given the severity of the Covid-19 pandemic, we have been asked to perform this ramp as quickly as possible with plans to attempt to achieve this in April."  Again, previously Shinano had only provided to Honeywell approximately 1,000 ASPINA Blowers per year.

31.     On March 30, 2020, Honeywell informed Shinano in an urgent conference call that it needed "3000 blowers/week from now until further notice.  The special demand could last until August/September."  To support the increased demand and stress the urgency of the task at hand, Honeywell told Shinano that its CEO, Darius Adamczyk, was to meet with "Trump at 5 pm today [Monday, March 30, 2020] and will need to commit [to] Trump [on] how many PAPRs [Honeywell] can supply" by "tomorrow."  Honeywell represented that the increased demand was based on a "commitment from the U.S. government."  Honeywell's CEO did, indeed, appear with President Trump on March 30, 2020, at a press conference for the Coronavirus Task Force.[5]

32.     Later that day, Shinano agreed to ramp up production and set targets to meet the 3,000 unit per week demand by late April, such that it could deliver "63K-72K air pumps in total from 5/8 to 9/25" after the initial ramp-up.  In that same communication to Michael Benson and Alex Grigorow at Honeywell, and consistent with the SSA, Shinano warned Honeywell that it could not "request cancel or scrap [the custom ASPINA Blower units] sometime in the future"

---

[5] https://www.youtube.com/watch?v=uPYopSUhVtQ.

while "everyone within [the Shinano] team is working very hard and strive our best to save lives and help people."

33.     Over the next several days and weeks, Shinano continued to confirm to Benson and Grigorow of Honeywell that the extraordinary measures being taken to meet Honeywell's demands were based on "the commitment from the U.S. government." Honeywell repeatedly insisted, through Benson, Anil Kumar, and others, that the U.S. government was committed to purchasing the units being requested. Moreover, Shinano's communications with Honeywell assumed that the units would be shipped to North America, consistent with Honeywell's representations that the U.S. government was committed to purchasing the units.

34.     At the exact same time as Honeywell was demanding that Shinano ramp up production and reduce the delivery timeline for the ASPINA Blowers, Honeywell was also ramping up production on N95 masks to capitalize on the profitable margins offered on those products when sold to the U.S. government. Similar to how Honeywell told Shinano that Honeywell had the support of the U.S. government in ramping up production of the PAPR unit, Honeywell's CEO stated in press releases relating to N95 masks that "[w]e are honored to support the U.S. government's efforts to protect Americans with personal protective equipment made right here in the United States."[6]

35.     In mid-April, Honeywell, through Benson and Grigorow, was still pressuring Shinano to deliver ASPINA Blower units quickly and forecasted ordering substantially more units from "October and beyond." During this time, Shinano informed Honeywell that the "[n]ormal lead time of delivery is 120 days in the quote."

---

[6] https://www.honeywell.com/us/en/news/2020/03/n95-mask-and-the-coronavirus-more-production-underway.

36.     In April 2020, analysts forecasted that Honeywell would take a significant hit in the market based on halted orders in its "aerospace segment," which "accounts for 45% of the company's total profits," but expected that decline to be at least somewhat offset by "the company's safety products [that] are seeing high demand in the current crisis. The company has ramped up the production of N95 masks, among other protective gear."

37.     As Honeywell's CEO would later state, "[e]arly in the pandemic, we initiated an unprecedented ramp-up in the production of personal protective equipment, including N-95 masks, to help protect frontline workers."[7]  In expounding upon this production, Honeywell stated in its public filings that:

> Honeywell rapidly expanded its domestic PPE production operations as part of its response to the COVID-19 pandemic. The company delivered N95 respirators and disposable surgical face masks to multiple locations in the U.S. for healthcare systems, the Federal Emergency Management Agency, and the U.S. Department of Health and Human Services. In addition, the company shipped millions of masks to state and local governments in support of their response to COVID-19 and for their PPE stockpiles. The company achieved a significant milestone by delivering more than 225 million respirators and face masks in one month.[8]

Plainly, as Honeywell's other business units struggled, Honeywell saw an opportunity to capitalize on the sales of high margin PPE as part of the pandemic. It did so by ramping up production on N95 masks and PAPR units and selling those items to the U.S. government and others at favorable margins.

38.     Indeed, by mid-May, Honeywell—through Benson and confirmed through Maria Adriana Vazquez, Anil Kumar, and Roberto Medina—ordered 36,000 additional ASPINA Blower

---

[7] https://investor.honeywell.com/static-files/c8ea4102-668b-488a-a4a0-24db608a08b4.
[8] https://investor.honeywell.com/static-files/c8ea4102-668b-488a-a4a0-24db608a08b4.

units for October through December 2020, on top of the 72,000 units ordered through the end of September 2020.

39.     On June 24, 2020, Honeywell, through Kumar, further increased its expectations by requesting that Shinano manufacture 6,000 ASPINA Blower units per week for the next 10 to 12 weeks.  Kumar was clear that the units should be shipped to Shinano's California warehouse.

40.     By early July, and as confirmed in July 9 and July 14, 2020, correspondence from Honeywell authored by Kumar and copying Vazquez, Honeywell had placed Purchase Orders with Shinano for 112,000 ASPINA Blower units, all of which Honeywell demanded for delivery by the end of 2020.

41.     Throughout the June and July 2020 period, Honeywell continued to pressure Shinano to expedite production of the ASPINA Blower units, emphasizing as late as July 20, 2020, that Shinano needed to expedite production so that Honeywell could outpace its competitors and maximize profits.  Specifically, Honeywell through Kumar informed Shinano that:

> These are not normal demand nor general industrial use products..
> These orders are for COVID business..  The more we produce,
> more can be sold.  Every organization including our competitors
> will now be looking to take this opportunity to sell more in this
> small window 6-7 months..

42.     Honeywell's position that it could profit from PPE equipment during the pandemic was hardly a secret, with the Wall Street Journal reporting in the summer of 2020 that Honeywell's sales numbers were falling across its core businesses, with its sales of PPE equipment including N95 masks being its lone revenue bright spot.[9]

---

[9] https://www.wsj.com/articles/honeywells-safety-equipment-sales-rise-but-aerospace-demand-falls-11595590157.

43.     To meet demand for the PAPR units, Honeywell insisted that Shinano take unprecedented business measures and risks to help it in this endeavor, as Shinano described in later correspondence:

> When the COVID outbreak started, there were many uncertainties surrounding the spread of the virus. What was known was that first responders needed protection and your team and our team went to great lengths to help and to provide equipment to save lives.
>
> This extraordinary situation required extraordinary measures.
>
> This meant that we had to make non-cancellable commitments to our supply base during a time where these suppliers where shutdown. And in order to get them to take the risk of opening, we had to provide assurance of the volume cases that would make it worthwhile. It also meant that we had to make hard commitments to the labor group to get them to man the assembly lines, for 3 shifts a day during a time when the virus was spreading.
>
> And we exceeded expectation in bringing it all together and to start providing the blowers in a short timeframe.

44.     Honeywell did not tell Shinano that any specific PAPR units were intended for foreign export. Indeed, and as set forth above, Honeywell repeatedly affirmed that the production was based on a commitment from the U.S. government and that the units should be shipped to the United States upon completion.

45.     To handle Honeywell's exponential increase in orders of the ASPINA Blower along with demands that Shinano cut its production time in half, beginning in March 2020, Shinano took extraordinary efforts and expense to (i) move production equipment to new locations to mitigate exposure risks relating to COVID, (ii) negotiate with local authorities to allow workers to return to work despite safety protocols urging caution, and (iii) engage third-party labor pools at great expense and to work the 24/7 schedule required. These efforts were taken to specifically meet Honeywell's rigorous demands.

**Federal Emergency Management Agency Issues a Rule Regarding Exportation of Personal Protective Equipment**

46.     On April 10, 2020, the United States Federal Emergency Management Agency ("FEMA"), under the direction of then-President Trump's administration, published a temporary final rule prioritizing the use of health and medical resources, including personal protective equipment (PPE), for domestic uses and restricted exportation of PPE. *See* 44 C.F.R. § 328, 85 F.R. 20195. Specifically, the rule designated air-purifying respirators, N95 respirators, and PPE surgical masks, among others, as scarce or threatened materials limited to domestic use. *Id.* As a result, the exportation of these PPE devices was not permitted without explicit approval by FEMA, effective through August 10, 2020. *Id.*

47.     On August 10, 2020, FEMA made minor changes to the April 10, 2020, temporary final rule and extended it until December 31, 2020. *See* 44 C.F.R. § 328, 85 F.R. 48113. On December 31, 2020, FEMA again extended the temporary final rule until June 30, 2021. *See* 44 C.F.R. § 328, 85 F.R. 86835. On January 26, 2021, FEMA issued a Press Release noting that "the domestic supply of certain covered materials may now exceed the demand within the United States. FEMA recognizes that there may no longer be a need to disrupt the supply chain of such materials and require that the entire domestic production of these items be allocated for domestic use as scarce or threatened covered materials."[10] Accordingly, if sellers of PPE believe they "have a surplus of a covered material and can demonstrate a good-faith and unsuccessful attempt to sell the material domestically, you may submit a request to FEMA to allow the material to be exported." *Id.*

---

[10] https://www.fema.gov/press-release/20210419/important-information-regarding-fema-temporary-final-rule-prioritization-and.

**Honeywell's Request to Delay Delivery Timelines**

48.     On August 21, 2020, Honeywell abruptly changed the delivery schedules on its orders, seeking to delay large portions of its orders that were already completed or in the process of being made.  Remarkably, Honeywell's email from Kumar informing Shinano about the "huge demand changes" came without explanation or comment.

49.     After repeatedly requesting clarification on the dramatic delivery schedule changes, Shinano informed Honeywell that—aside from the timing of delivery—it could not agree to the modification or cancellation of product orders already in the manufacturing process because Shinano had to "make firm non-cancellable commitments to our supply base and to the labor group" in order to accommodate Honeywell's 112,000-unit orders, as the SSA clearly provided that time was of the essence.  Nonetheless, Honeywell through Adriana Vazquez (Procurement Ops Leader) and Kumar pushed Shinano to modify previously agreed-upon delivery schedules and requested cancellation of 12,000 units, which Shinano refused based on the fact that the units were custom Products not subject to cancellation or termination under section 2.4 of the SSA.

50.     Though Honeywell would raise the excuse much later, only one piece of correspondence from Honeywell suggested that FEMA restrictions were going to impact Honeywell's orders of the ASPINA Blower.  On August 31, 2020, Kumar stated that "Proportionate EU orders needs to be cancelled, US Govt has blocked export of finished respiratory products outside US.. so there is push on EU products for faster ramp-up."  Far from cancelling the orders however, Kumar told Shinano that Honeywell "definitely will take any materials by AIR/ or Ocean for the surge demand if it comes.." while claiming for the first time that "[t]hese products were developed as a global product, but now due to restrictions its only sold within Americas.."

51.     Kumar's communication ignored that the FEMA export restrictions were not new at all but had been in place since April 10, 2020.  Indeed, the August modification merely extended the same FEMA restrictions through the end of the year, but Honeywell had placed and finalized virtually all of its orders after the time the restrictions had first been put in place.  Moreover, the 36,000 units ordered in mid-May and which make up the majority of the open orders underlying this suit were placed *after* the FEMA restrictions were put in place.

52.     Moreover, Kumar and others at Honeywell had repeatedly represented that Honeywell had a purchase commitment from the U.S. government and had Shinano ship completed units to the United States.  Prior to this communication, Honeywell had not represented that the PAPR units were being shipped to or sold in Europe.

53.     Notwithstanding Kumar's fleeting reference to U.S. government restrictions, even in that same August 31 communication, Honeywell affirmatively represented that it "will be taking 80-85K from until Dec, Balance 2k/month from Jan-June, 2021.."  Kumar also made clear that the number of units destined for Europe was relatively small, stating that "10-11K sets needs to be cancelled, which is proportionate to EU orders.."  Thus, the impact of the FEMA restrictions was, at worst, de minimis, and Shinano ultimately accommodated Honeywell to Shinano's detriment by cancelling 6,000 orders based on the numbers purportedly destined for Europe.

54.     From August through October 2020, Honeywell continued to assure Shinano that it still needed the ASPINA Blower units that it had ordered but simply on a more relaxed timeline.

55.     On September 25, 2020, Honeywell through Kumar informed Shinano that it should accept cancellation of 12,000 units as a reasonable "ask for 110k total orders (10% +/-)."  In other words, Honeywell was not attempting to cancel the vast majority of its orders but was only attempting to cancel 12,000 units that were purportedly ordered for Europe.  Shinano

continued to complete the ordered ASPINA Blower units given Honeywell's continued assurances.

56.     Again, on September 30, 2020, Kumar at Honeywell wrote insisting that Honeywell still wanted nearly 85,000 units through December 2020, with an additional 12,000 units through June 2021.

57.     On October 13, 2020, Kumar at Honeywell once again reaffirmed Honeywell's commitment to purchase 97,000 units.

58.     On October 27, 2020, Kumar and Vazquez at Honeywell maintained the same position but informed Shinano that it wanted to hold shipment of 24,500 units until the end of the year while promising that the remaining units could be delivered at a rate of 2,000 units per month from January through June 2021.  Honeywell explained to Shinano that it had inventory balance sheet concerns such that it wanted to delay delivery, a request Shinano honored to its detriment at the cost of $10,000 per month for storage.

59.     Throughout December 2020 and January 2021, Honeywell continued to assure Shinano that it would accept shipment of the units at the beginning of 2021, save for the cancellation of 6,000 units agreed to by the parties on December 15 (and which constituted over half of what Honeywell claimed it ordered for Europe).  For example, on December 18, 2020, and again on January 14, 2021, Vazquez at Honeywell confirmed the shipment schedule.

60.     On January 15, 2021, however, Vazquez again asked to delay shipment of the 24,500 units that were supposed to be accepted by Honeywell for delivery in January.

61.     By January 29, 2021, Honeywell had still failed to provide Shinano with instructions relating to delivery of the ASPINA Blowers, causing Shinano to again request further instructions on shipment.

62.     On February 1, 2021, Kumar at Honeywell promised that Honeywell was "working with Marketing to get the numbers for sales.. will confirm the demand by this week.. Please note, we will definitely start taking materials soon.."

**Honeywell's Refusal to Accept Delivery of the ASPINA Blower Units**

63.     Only in mid-February 2021, after months of continued assurances that it still needed the ASPINA Blower units, did Honeywell begin to indicate that it was not going to accept shipment at all.  This came as a surprise to Shinano because it had completed manufacturing 35,184 units and had assembled 11,500 in-progress component kits unique to the ASPINA Blower (collectively, the "Outstanding Products"), acting in reliance on Honeywell's continued and repeated assurances of performance.

64.     On or about February 15, 2021, Kumar at Honeywell asked Shinano for the cost of continuing to store the units rather than greenlighting shipment of the ASPINA Blower units that were completed and supposed to have been delivered.

65.     On February 19, 2021, Alban Gousset, Procurement Leader – PPE GBE of Honeywell, asked for the amount outstanding on all units, completed or otherwise, assuming cancellation, including costs of production, shipping, holding charges, and storage costs.

66.     Later in the day on February 19, 2021, Shinano informed Gousset that Shinano's outstanding costs, assuming cancellation rather than completion, totaled $2,806,459.44 along with Shinano's storage costs.

67.     The next day, Honeywell did not dispute the amount owed.  Instead, Gousset admitted that the cancellation was a "wrongdoing from HON" (*i.e.*, Honeywell) but wanted Shinano to "share part of the pain" (*i.e.*, to reduce its demand):

**From:** Gousset, alban <alban.gousset@Honeywell.com>
**Sent:** Saturday, February 20, 2021 12:15 PM
**To:** Nick Lauro <nlauro@shinano.com>; N.R, Anil <Anil.N.R@Honeywell.com>
**Cc:** Sawato Aizeki <saizeki@shinano.com>
**Subject:** RE: [External] FW: Shinano Blower Delivery Updates - Meeting Notes 10/27/2020

Nick,

Please work a better solution/ proposal with Anil on the next 2-3 days that I could bring forward to PPE President.
As you know we occur also a strong impact from the cancellation of the Government order. We expect on this specific case that everybody will take a share part of the pain.

As you know it is not only a wrongdoing from HON but a COVID19 issue.
I will appreciate that you strongly review what can be done for the part in US and be very aggressive on the solution for the part on Japan.
As you know HON is fully at lost for all this program and we expect the best support from your side.

Thanks

Alban Gousset
Procurement Leader – PPE GBE
Honeywell | Safety and Productivity Solutions

68. This was the first time Honeywell informed Shinano that a Government order had been cancelled. Honeywell also vaguely attempted to excuse its "wrongdoing" by blaming COVID-19 – the very pandemic Honeywell sought to capitalize on and profit from. Indeed, while Honeywell's sales of the PAPR unit may not have met its profiteering expectations during the pandemic, the New York Times reported that as of February 10, 2021, the two largest U.S. manufacturers of N95 masks, Honeywell and 3M, were producing 120 million masks per month combined.[11] By April 2021, Honeywell was doing so well producing N95 masks that it announced partnerships with entertainers to produce "fashionable" and "high-tech face masks," intended to retail at $299 per mask.[12] In May 2021, Allied Market Research estimated that the global face mask market, valued at $6.792 million in 2019, would reach $9.052 billion by 2027. The report noted that "the U.S. government has ordered Honeywell International to expand its production of

---

[11] https://www.nytimes.com/2021/02/10/health/covid-masks-china-united-states.html.
[12] https://www.cnbc.com/2021/04/06/william-and-honeywell-make-bet-on-fashionable-high-tech-face-masks.html.

N95 masks in the country, so that masks are available for general public also."[13]  In its 2021 annual report, Honeywell reported that it invested about "$300 million in new mask production capacity globally."[14]

69.     Across all business units, Honeywell had net sales of $32.6 billion and net income of $4.779 billion in 2020, and net sales of $34.4 billion and net income of $5.542 billion in 2021. Honeywell's revenue from Safety and Productivity Solutions, the division that includes N95 mask production and production of the PAPR units, saw net sales increase from $6.1 billion in 2019 to $7.8 billion in 2021.[15]

70.     Despite its clear success in capitalizing on PPE during the pandemic, Honeywell refused to accept delivery or pay what was owed to Shinano.  Instead, on February 22, 2021, Honeywell, through Kumar and Gousset, demanded to pay only $1,496,000 for its outstanding orders, approximately 50% of the amount outstanding.  Shinano rejected the proposal, stating that "That figure is not acceptable.  ASPINA did nothing wrong and build according to Honeywell's high demand.  Now Honeywell is asking ASPINA to take more than $1M hit on these parts."

71.     Notwithstanding that Honeywell was contractually obligated to pay for the entirety of its orders, in hopes of resolving the parties' dispute, on February 23, 2021, Shinano agreed to accept $2.4 million, a haircut of more than $400,000.

72.     Shortly thereafter, on March 31, 2021, Gousset at Honeywell ended the parties' discussion and directed Shinano to its outside counsel should it wish to pursue the matter further.

73.     In total, since March 2020, Shinano has been paid for 62,424 ASPINA Blower units delivered to Honeywell.  Shinano is still seeking payment for an additional 35,184 units that have

---

[13] https://www.alliedmarketresearch.com/face-mask-market-A06289v.
[14] https://investor.honeywell.com/static-files/0f826f8b-fb20-4adc-a1e0-a841597316f1.
[15] https://investor.honeywell.com/static-files/0f826f8b-fb20-4adc-a1e0-a841597316f1.

been completed but of which Honeywell has refused delivery, and for 11,500 assembled component kits unique to the ASPINA Blower that Shinano was assembling based on Honeywell's continued and repeated assurances of performance.

74.     Shinano's total damages include the $2,806,459.44 outstanding plus another $160,000 or more in storage costs.  By and through this action, Shinano is seeking these damages, along with punitive damages, attorneys' fees, costs of suit, and any and all other relief available and that the Court deems appropriate.

### FIRST CAUSE OF ACTION
**(Breach of Contract for Non-Payment)**

75.     Shinano incorporates by reference the allegations contained in the foregoing paragraphs.

76.     The SSA is a valid and enforceable contract between Shinano and Honeywell.

77.     Pursuant to § 2.3 of the SSA, Honeywell was required to terminate any purchase orders within 30 days of issuance.

78.     Honeywell failed to terminate the Purchase Orders for the Outstanding Products within 30 days of issuance.  Accordingly, Honeywell was not permitted to terminate the Purchase Orders as of right and was obligated to pay for the Outstanding Products.

79.     Pursuant to § 2.4 of the SSA, in the event Honeywell terminated the SSA, it was required to pay for unique raw materials, work in progress, and finished products for all custom Products it had ordered but that were not yet delivered.

80.     Honeywell effectively terminated the SSA through its conduct including but not limited to by (i) failing to accept the Outstanding Products within the delivery schedules agreed to between the parties, and (ii) terminating discussions between the parties regarding the Outstanding Products, among other reasons.

81. The ASPINA Blower units were custom Products manufactured and developed for Honeywell.

82. Shinano demanded that Honeywell pay $2,966,459.44, which represents the amount attributable to (i) unique raw materials, (ii) work in progress, (iii) finished products, and (iv) storage fees for the Outstanding Products, which Shinano was ready and willing to deliver within the applicable lead times.

83. Notwithstanding Shinano's numerous attempts to collect, Honeywell has refused to pay Shinano and, therefore, has materially breached the SSA.

84. Shinano has performed all of its material obligations pursuant to the SSA.

85. As a direct and proximate result of Honeywell's numerous breaches of contract, Shinano has suffered damages in an amount to be determined at trial but no less than $2,966,459.44 together with interest thereon at the maximum allowable legal rate.

**SECOND CAUSE OF ACTION**
**(In the Alternative, Breach of Contract as Modified in Writing)**

86. Shinano incorporates by reference the allegations contained in the foregoing paragraphs.

87. The SSA is a valid and enforceable contract between Shinano and Honeywell.

88. Pursuant to § 2.3 of the SSA, Honeywell "may terminate any Purchase Order without liability on the part of Honeywell upon 30 days' prior written notice."

89. However, pursuant to the parties' email communications and other correspondence, the parties jointly agreed to modify the SSA such that orders placed due to COVID-19 demand could not be scrapped or cancelled.

90.     The SSA provided for a Lead Time of five days for a given Purchase Order so long as it was for a minimum of 400 up to a maximum of 800 ASPINA Blower units.  SSA § 6.1, Ex. A.

91.     The SSA also provided for a 60-day replenishment lead time for Shinano to replenish its inventory of ASPINA Blower units.  SSA § 6.1, Ex. A.

92.     Pursuant to the parties' email communications and other correspondence, the parties jointly agreed to modify the SSA such that Shinano was required to produce 112,000 ASPINA Blower units between March and December 2020, far exceeding the production and lead times specified in the SSA.

93.     In compliance with the modified SSA, Shinano has been paid for 62,424 ASPINA Blower units delivered to Honeywell since March 2020.

94.     However, although Shinano has repeatedly requested that Honeywell accept delivery of the 35,184 ASPINA Blower units that have been completed, Honeywell has refused delivery.  Further, Shinano had assembled 11,500 component kits unique to the ASPINA Blower, which were in progress as of February 2021.  Honeywell has not agreed to accept delivery of the component kits either.

95.     Despite demands from Shinano for payment, Honeywell has refused to pay the $2,966,459.44, which represents the amount attributable to (i) unique raw materials, (ii) work in progress, (iii) finished products, and (iv) storage fees for the Outstanding Products.

96.     Accordingly, Honeywell has materially breached the modified SSA.

97.     Shinano has performed all of its material obligations pursuant to the modified SSA, including by complying with Honeywell's requests to exponentially increase its production capacities even in the face of numerous hurdles due to COVID-19.

98.     As a direct and proximate result of Honeywell's numerous breaches of contract, Shinano has suffered damages in an amount to be determined at trial but no less than $2,966,459.44, together with interest thereon at the maximum allowable legal rate.

### THIRD CAUSE OF ACTION
**(For Breach of the Implied Covenant of Good Faith and Fair Dealing)**

99.     Shinano incorporates by reference the allegations contained in the foregoing paragraphs.

100.     The SSA contains an implied covenant that Honeywell shall at all times act in good faith and deal fairly with Shinano and will refrain from any acts which would prevent Shinano from realizing the intended benefits of the SSA including but not limited to by (i) refusing to accept delivery of the Outstanding Products after coercing Shinano to exponentially increase its production in the face of COVID-19, and (ii) requiring Shinano to "share the pain" (*i.e.*, taking a 50% loss on the Outstanding Products) after admitting Honeywell's "wrongdoing" in attempting to cancel the Purchase Orders for the Outstanding Products.

101.     By virtue of the allegations set forth in the paragraphs above, Honeywell has breached the implied covenant of good faith and fair dealing.

102.     As a direct and proximate result of Honeywell's breach of the implied covenant of good faith and fair dealing, Shinano has suffered damages in an amount to be determined at trial but no less than $2,966,459.44 together with interest thereon at the maximum allowable legal rate.

### FOURTH CAUSE OF ACTION
**(Fraud)**

103.     Shinano incorporates by reference the allegations contained in the foregoing paragraphs.

104.     When COVID-19 struck, Honeywell was faced with the likelihood of several dwindling lines of business.  With the drastic rise in the use of PPE by households and frontline

workers, Honeywell identified an opportunity to mitigate its losses by selling high-margin PPE products, including the PAPR.  As a result, Honeywell decided to scale its production of the PAPR and, in turn, sought Shinano to ramp up its production of the essential part for the PAPR, the ASPINA Blower units.

105.    In inducing Shinano to agree to manufacture 112,000 ASPINA Blower units, Honeywell represented to Shinano that it had a commitment from the U.S. government to purchase the PAPR such that Honeywell needed all the ASPINA Blower units it ordered from Shinano.

106.    Indeed, by virtue of the allegations set forth above, Honeywell told Shinano that its CEO, Darius Adamczyk, was to meet with then-President Trump at 5 PM on March 30, 2020, and needed to commit to President Trump on how many PAPR units Honeywell could supply.  *See supra* ¶ 31.  In exponentially increasing its demand of the ASPINA Blower units, Honeywell represented that the orders were based on a "commitment from the U.S. government." *Id.*

107.    Through March and April 2020, Shinano continued to confirm to Benson and Grigorow of Honeywell that the extraordinary measures being taken to meet Honeywell's demands were based on "the commitment from the U.S. government," a commitment Benson and Anil Kumar of Honeywell confirmed.  *See supra* ¶ 33.

108.    The representations that Honeywell had a commitment from the U.S. government for PAPR units requiring 112,000 ASPINA Blowers were false at the time they were made and were intended to induce Shinano's reliance and compel it to take extraordinary business risks.

109.    Alternatively, the representations that Honeywell had a commitment from the U.S. government for PAPR units requiring 112,000 ASPINA Blowers were made recklessly and without taking into account the realities relating to whether the U.S. government would accept

delivery of 112,000 PAPR units. These reckless statements were intended to induce Shinano's reliance and compel it to take extraordinary business risks.

110. Honeywell's failure to disclose that it did not have the commitment represented was not disclosed to Shinano until February 2021, when Honeywell indicated that its request to cancel and scrap all the Outstanding Products was due in strong part "from the cancellation of the Government order."

111. By means of these material misrepresentations of fact, Honeywell did in fact cause and induce Shinano to manufacture and store the Outstanding Products for Honeywell. If Shinano had known that Honeywell did not have a firm commitment and/or contract for sale of the PAPR with the U.S. government, it would not have manufactured and stored the Outstanding Products.

112. Indeed, Honeywell induced Shinano to take unprecedented business measures to make non-cancellable commitments to Shinano's supply base, move production equipment to new locations to mitigate exposure risks relating to COVID, negotiate with local authorities to allow workers to return to work despite safety protocols urging caution, and engage third-party labor pools at great expense and to work the 24/7 schedule required.

113. Shinano justifiably relied upon the aforementioned material misrepresentations of fact to its detriment.

114. Shinano has suffered damages as a direct and proximate result of the foregoing, including reputational damages.

115. Honeywell's bad faith and malicious, willful, reckless, wanton, and fraudulent actions warrant the imposition of exemplary and punitive damages.

116. Honeywell's fraud caused Shinano damages in excess of $2,966,459.44.

117.     Accordingly, Shinano is entitled to a money judgment for damages against Honeywell in an amount to be determined at trial but no less than $2,966,459.44 together with interest thereon at the maximum allowable legal rate and Shinano's attorneys' fees.

**FIFTH CAUSE OF ACTION**
**(Fraud)**

118.     Shinano incorporates by reference the allegations contained in the foregoing paragraphs.

119.     In August 2020, Anil Kumar, Tech Lead at Honeywell, informed Shinano that because the "US Govt has blocked export of finished respiratory products outside US," Honeywell needed to adjust the delivery schedules to (i) only require 80,000 to 85,000 ASPINA Blower units to be delivered through December 2020, (ii) promise that it would purchase 2,000 ASPINA Blower units per month from January through June 2021, and (iii) cancel "10-11K sets …, which is proportionate to EU orders."

120.     On September 30, 2020, Kumar at Honeywell indicated to Shinano that Honeywell still wanted nearly 85,000 units through December 2020, with an additional 12,000 units through June 2021.  Again on October 13, 2020, Kumar reaffirmed Honeywell's commitment to purchase 97,0000 units.

121.     Notwithstanding this representation, Honeywell refused to accept delivery of any additional ASPINA Blower units from August through December 2020.  Indeed, on October 28, 2020, Anil Kumar and other Honeywell employees requested Shinano to hold shipment of 24,500 of the units intended for delivery in the months of September, October, November, and December as a favor to address certain balance sheet concerns Honeywell was facing.

122.     On December 15, 2020, Sawato Aizeki met with Tex Moseri of Honeywell.  During the meeting, Moseri requested that Shinano continue to hold any further shipments through the

end of 2020 and stated that Honeywell would accept shipment of ASPINA Blower units beginning in 2021.

123.    On January 14, 2021, Maria Vazquez of Honeywell wrote to Mayumi Dabbay of Shinano requesting that 16,500 ASPINA Blower units be shipped to Honeywell from January through June 2021.

124.    By virtue of these representations, Honeywell continued to reassure Shinano that it needed the Outstanding Products, and Shinano relied on Honeywell's representations in continuing to manufacture and store the Outstanding Products.

125.    However, on January 15, 2021, Vazquez requested that Shinano refrain from shipping any ASPINA Blower units to Honeywell and stated that Honeywell would provide an update in one week.  Contrary to Honeywell's assertions, Honeywell failed to provide an update for several weeks.

126.    It was only in February 2021 that Honeywell expressed that it sought to cancel and scrap all the Outstanding Products.  This news came as a surprise after Honeywell repeatedly assured Shinano that it would purchase the ASPINA Blower units, notwithstanding months of delays.    Ultimately, Goussett of Honeywell explained that this conduct constituted a "wrongdoing," and Honeywell has since provided two purported excuses for the attempted cancellation:  (1) that FEMA restrictions on the export of PAPR and other PPE compelled Honeywell to cancel; and, (2) that "the cancellation of the Government order" compelled Honeywell to cancel its orders for the ASPINA Blower units.

127.    Neither excuse stands up to scrutiny; Honeywell knew at the time it was making continued assurances that it would accept delivery that it never actually intended to do so.  First, the FEMA restrictions were in place before Honeywell ordered the Outstanding Products, as the

restrictions were first implemented in April 2020 and later extended in August 2020, and the Outstanding Products were ordered from April to July 2020. By the time of Honeywell's cancellation attempt, Honeywell could have applied to FEMA for permission to export the PAPR. Moreover, Kumar admitted in August 2020 that the FEMA restrictions only applied to 10,000 to 11,000 orders. Thus, even if Honeywell's FEMA restriction excuse were valid rather than mere pretext, Honeywell knew at the time it was making its continued assurances of delivery that it would not accept delivery of the ASPINA Blower units.

128.     Second, "the cancellation of the Government order" excuse was not provided until February 2021, even though Honeywell never had a commitment from the U.S. government or, if it did, the U.S. government had cancelled its commitment before Honeywell made continued assurances from August 2020 through January 2021 that it would accept delivery and pay for the ASPINA Blower units.

129.     By means of these material misrepresentations of fact and/or omissions, Honeywell did in fact cause and induce Shinano to manufacture and store the Outstanding Products for Honeywell. If Shinano knew that Honeywell would not pay for the Outstanding Products, it would not have manufactured and stored the Outstanding Products.

130.     Shinano justifiably relied upon the aforementioned material misrepresentations of fact and omissions, including by taking unprecedented business measures to make non-cancellable commitments to Shinano's supply base, moving production equipment to new locations to mitigate exposure risks relating to COVID, negotiating with local authorities to allow workers to return to work despite safety protocols urging caution, and engaging third-party labor pools at great expense and to work the 24/7 schedule required.

131.  Shinano has suffered damages as a direct and proximate result of the foregoing, including reputational damages.

132.  Honeywell's bad faith and malicious, willful, reckless, wanton, and fraudulent actions warrant the imposition of exemplary and punitive damages.

133.  Honeywell's fraud caused Shinano damages in excess of $2,966,459.44.

134.  Accordingly, Shinano is entitled to a money judgment for damages against Honeywell in an amount to be determined at trial but no less than $2,966,459.44 together with interest thereon at the maximum allowable legal rate and Shinano's attorneys' fees.

**SIXTH CAUSE OF ACTION**
**(Negligent Misrepresentation)**

135.  Shinano incorporates by reference the allegations contained in the foregoing paragraphs.

136.  At the time Honeywell ordered 112,000 ASPINA Blowers on an expedited basis, Honeywell was aware that Shinano would rely on the accuracy of Honeywell's assertion that (i) there was a "special demand" for the ASPINA Blowers based on a "commitment from the U.S. government," and (ii) Honeywell had the support of the then-President of the United States to supply these products to the U.S. government, as detailed *supra*.

137.  Based upon Honeywell's (i) extensive experience with the federal government and in obtaining federal contracts, (ii) superior knowledge regarding whether it had a commitment from the U.S. Government on this particular project, and (iii) awareness that Shinano would rely upon Honeywell's representations in exponentially increasing the scale of its operations during a global pandemic, as fully detailed *supra*, Honeywell owed a special duty to impart correct and accurate information regarding the existence of that commitment to Shinano.

138. Honeywell made these representations to Shinano even though Honeywell never had a commitment from the U.S. government or, if it did, the U.S. government had cancelled its commitment before Honeywell made continued assurances from August 2020 through January 2021 that it would accept delivery and pay for the ASPINA Blower units. Accordingly, Honeywell knew or should have known that its representations regarding a commitment from the U.S. government were materially false.

139. Shinano did reasonably, justifiably, and detrimentally rely on the accuracy of Honeywell's representations in manufacturing and storing the Outstanding Products. Indeed, Shinano's reliance on Honeywell's representations was foreseeable, reasonable, and justified given Honeywell's superior and exclusive knowledge regarding a commitment from the U.S. government.

140. Honeywell breached its duty to Shinano to impart correct information by negligently misrepresenting or omitting information regarding the existence of a commitment from the U.S. government, as detailed *supra*.

141. Shinano has suffered damages as a direct and proximate result of the foregoing, including reputational damages.

142. As a result of Honeywell's false and misleading misrepresentations, Honeywell caused Shinano damages in excess of $2,966,459.44.

143. Accordingly, Shinano is entitled to a money judgment in an amount to be determined at trial but no less than $2,966,459.44 together with interest thereon at the maximum allowable legal rate and Shinano's attorneys' fees.

## REQUEST FOR RELIEF

WHEREFORE, Shinano respectfully request that the Court enter judgment in their favor and against Honeywell as follows:

(a)     On the First, Second, Third, Fourth, Fifth, and Sixth Causes of Action, damages in an amount to be determined at trial but no less than $2,966,459.44;

(b)     For actual damages, consequential damages, and punitive damages to be determined at trial, plus the maximum allowable statutory interest;

(c)     For an award of reasonable attorneys' fees and costs, to the extent permitted by law; and

(d)     For such other relief as the Court deems just and proper with costs and disbursements of this action.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Shinano demand a trial by jury of all issues so triable.

Dated: New York, New York
         May 6, 2022                         DAVIS WRIGHT TREMAINE LLP

                                             By: */s/ Mohammad B. Pathan*
                                             Mohammad B. Pathan
                                             1251 Avenue of the Americas, 21st Floor
                                             New York, New York 10020
                                             Telephone: (212) 603-6414
                                             mohammadpathan@dwt.com

                                             Spencer Persson (*pro hac vice application forthcoming*)
                                             865 South Figueroa Street, 24th Floor
                                             Los Angeles, California 90017-2566
                                             Telephone: (213) 633-6800
                                             spencerpersson@dwt.com

                                             *Attorneys for Plaintiffs Shinano Kenshi Corporation and Shinano Kenshi Co., Ltd.*