# EXHIBIT A

# STRATEGIC SUPPLIER AGREEMENT

This Strategic Supplier Agreement ("**Agreement**") is effective October 1, 2017 (the "**Effective Date**") and is between Honeywell International Inc., on behalf of itself and its affiliates ("**Honeywell**"), and Shinano Kenshi Co., Ltd., a Japan Company, on behalf of itself and its affiliate, Shinano Kenshi Corporation, a California corporation ("**Supplier**").

In consideration of the mutual covenants, obligations and promises in this Agreement, the parties agree as follows:

## AGREEMENT

**1.0**    **SCOPE OF AGREEMENT.**  Supplier will sell Honeywell the products listed on **Exhibit A** (the "**Products**") together with related services, if any.  This Agreement does not specify a quantity of Products to be purchased by Honeywell, does not obligate Honeywell to purchase any Products, and is not an exclusive purchasing agreement.

**2.0**    **TERM AND TERMINATION.**

2.1    This Agreement will begin on the Effective Date and remain in effect for three (3) years (the "**Term**") and will automatically renew for successive one-year periods unless earlier terminated as set forth below.

2.2    Either party may immediately terminate this Agreement in the event (a) of a material breach by the other party of its obligations under this Agreement or any Purchase Order (defined below) which remains uncured 30 days after receipt of the notice of breach, except in the case of breach related to safety, health, security, or any misuse or disclosure of Honeywell's intellectual property rights or Confidential Information, Honeywell will have the right to immediately terminate this Agreement, (b)  the other party becomes insolvent or suspends any of its operations or if any petition is filed or proceeding commenced by or against such party under any law relating to bankruptcy, arrangement, reorganization, receivership or assignment for the benefit of creditors, or (c) the other party breaches its obligations under any applicable export laws or is placed on any debarred list for violation of any applicable export control laws or regulations.  Honeywell may immediately terminate if Supplier experiences a Change of Control.  "**Change of Control**" means (whether in a single transaction or in a series of transactions): the sale or transfer of all or substantially all of a party's assets or any material asset to any third party; the acquisition of a party by any third party or parties including, without limitation, by any reorganization, merger or consolidation, whether with or into any other third party or parties or otherwise; or the acquisition by a third party or parties of beneficial ownership of more than 50% of the voting power of a party.  If a termination by Honeywell for breach by Supplier is determined to have lacked cause, such termination will be treated as a termination for convenience under Section 2.3 below.

2.3    Honeywell may terminate this Agreement for convenience upon 30 days' prior written notice.  Honeywell may terminate any Purchase Order without liability on the part of Honeywell upon 30 days' prior written notice.

2.4    Termination is without liability to Honeywell except for payment for completed Products delivered and accepted by Honeywell before the date of termination; provided that if Honeywell terminates this Agreement under Section 2.3 above, Honeywell's sole liability to Supplier, and Supplier's sole and exclusive remedy, is payment for (A) Products received and accepted by Honeywell before the date of termination, and (B) with respect to custom Products that are within lead time under the terminated Purchase Order(s), unique raw materials, work in progress and finished Products, which shall be delivered to Honeywell.  Honeywell's payments to Supplier can be set off against damages to Honeywell.  Upon termination, Honeywell may, in addition to any other rights it may have, require Supplier to deliver to Honeywell (a) completed Products (subject to Honeywell's obligation to pay for them); and (b) drawings, specifications, plans, information, hardware and software that Supplier has produced or acquired specifically for the performance of this Agreement or any Purchase Order.  Supplier must supply the Products in accordance with the terms of this Agreement for Purchase Orders issued, but unfulfilled, prior to any termination or expiration of this Agreement.

2.5    At Honeywell's request, Supplier will provide for a period up to 6 months after termination or expiration of this Agreement, reasonable termination/expiration assistance requested by Honeywell to allow the manufacture of the Products to continue without interruption or adverse effect and to facilitate the orderly transfer of the

manufacture of the Products ("**Supplier Assistance**"). Supplier Assistance will be provided at a mutually agreed cost and will include the following:

(a)     Within 30 days after a request from Honeywell, Supplier will provide a complete plan for operational turnover that enables a smooth transition of the functions performed by Supplier under this Agreement to Honeywell or a successor vendor ("**Turnover Plan**"). Upon Honeywell's approval of the Turnover Plan, Supplier will provide Supplier Assistance in accordance with such Turnover Plan.

(b)     Supplier will attend periodic review meetings called by Honeywell, during which the parties at a minimum will review Supplier's performance of Supplier Assistance, including the completion of tasks and deliverables set forth in the Turnover Plan.

2.6     Notwithstanding any termination or expiration of this Agreement, those provisions which by their very nature are intended to survive the termination or expiration of this Agreement will so survive such termination or expiration, including without limitation Sections 2, 10 -12, 15-19, and 24.

## 3.0     PRODUCT PURCHASES.

3.1     Honeywell and each of its business units, divisions, affiliates and subsidiaries worldwide may order Products and related services, if any, by means of individual purchase orders ("**Purchase Orders**") and such sales shall be subject to the terms of this Agreement. Any terms specific to such purchases different from those contained in this Agreement will be evidenced by a separate mutually agreed writing which references this Agreement.

3.2     Each Purchase Order will be deemed immediately accepted and binding upon Supplier, unless it requires delivery of Products in less than the Lead Time (as defined in Section 6.1), or if the delivery quantity exceeds the Minimum Stocking Level, or if the price is inaccurate, as listed in **Exhibit A**, in which case Supplier may reject such Purchase Order within 2 business days of receipt.

3.3     Purchase Orders will be governed exclusively by the terms and conditions of this Agreement and any additional or different terms and conditions contained in any Purchase Order, Purchase Order acknowledgment or acceptance are not binding on either party.

3.4     Purchase Orders may be communicated by Honeywell to Supplier via any method agreed upon by the parties. The parties will not contest the validity or enforceability of Purchase Orders transmitted electronically under the provisions of any law requiring that contracts be in writing and signed by the party to be bound.

3.5     Intentionally omitted.

3.6     Supplier will provide Honeywell with (a) the Harmonized Tariff Schedule number, country of origin information or certificates, manufacturer's affidavits, applicable free trade agreement ("**FTA**") certificates, and any other documents or information Honeywell may require to comply with international trade regulations or to lawfully minimize duties, taxes, and fees, and (b) FTA certificates for all Products that qualify under one or more FTAs. Supplier will provide Honeywell all documents, records, and other supporting information necessary to substantiate the Products' qualification under an FTA. Supplier will exert reasonable efforts to qualify the Products under FTAs.

## 4.0     PRODUCT COMPONENTS.

4.1     Supplier is responsible for obtaining all raw materials, components, and services required by Supplier to perform under this Agreement ("**Components**"). Honeywell may, in its sole discretion, direct Supplier to purchase Components from Honeywell affiliates, subsidiaries, business units or divisions or third party suppliers ("**Honeywell Provider**"). Where the Components are purchased under a Honeywell negotiated pricing agreement with a third party, such Components are for the sole use of Supplier in the manufacturing process pursuant to this Agreement, and will not be resold (whether in the form acquired or after incorporation into other goods) to any party other than a Honeywell business unit, subsidiary, or Honeywell designee ("**Designee**").

4.2     Supplier will sell the Products covered under this Agreement to Designees, if so directed, under the same terms and conditions of this Agreement.

Honeywell Internal

4.3    Honeywell has no liability for any transactions between Supplier and a Honeywell Provider or Designee and Supplier will not look to Honeywell for fulfillment of any obligations of a Honeywell Provider or Designee. Regardless of whether Honeywell directs Supplier to use a specific Honeywell Provider, Supplier is solely responsible to ensure that all Components meet required specifications, operate as intended and are free from all defects in workmanship and materials. Supplier is solely liable if a Component fails to conform to applicable specifications or is otherwise defective.

4.4    From time to time, Honeywell may provide recommendations and/or assistance to Supplier with respect to Supplier's manufacturing processes, assembly operations, supply chain management and other Supplier operations, procedures and processes (the "**Processes**"). Regardless of such assistance or recommendations, Supplier is solely liable for the Processes and the results of such Processes including, without limitation, costs associated with the Processes and Products produced from such Processes.

## 5.0    PRODUCT AND MANUFACTURING CHANGES.

5.1    Supplier will not make any changes in the design, materials, manufacturing location, manufacturing equipment, production process, changes between a manual and automated process, subcontracting any processes, or any other processes related to the Products, their labeling or packaging without Honeywell's prior written approval. This requirement applies whether or not the change affects costs and regardless of the type of change, including Product improvements. Supplier will notify Honeywell of any such potential changes promptly as it becomes aware of them. To request approval, Supplier will provide a plan to Honeywell at least 6 months in advance of any such change, including without limitation, the retirement of any Product. Any such plan is subject to Honeywell's written approval and must demonstrate that Supplier has taken all necessary actions to avoid negative impacts to Honeywell, including, but not limited to, maintaining additional inventory, overlapping production schedules, etc. Such price reductions will be agreed to by Supplier and Honeywell prior to implementation. At Honeywell's option, Supplier will reimburse Honeywell for all expenses incurred by Honeywell related to costs of re-qualification of Products resulting from manufacturing location changes or any material, design or sub-tier supplier change. Supplier will afford Honeywell the opportunity to purchase any quantity of any retired Product as a last-time buy, on the pricing set forth in this Agreement and pursuant to the terms and conditions of this Agreement, and Honeywell may schedule delivery for any time during the subsequent 2 years. Supplier will flow down this requirement in all its subcontracts and purchase orders for purchased goods or process-related services required for the Products, whether such Products are supplied to Supplier as an end item, a component part of an end item, or an individual piece part.

5.2    Supplier will actively work with each Component Manufacturer to determine if any changes or discontinuance of any Component will occur ("**Provider Change**"). If any Provider Change is planned, then Supplier will provide Honeywell with as much advance written notice as possible and, subject to Honeywell's prior written approval: (a) establish an end-of-life quantity last time buy; and (b) identify and procure alternate replacement items. Honeywell may schedule delivery for any time during the subsequent 2 years.

5.3    If requested by Honeywell to make a change to a Product specification or design, Supplier will not unreasonably refuse to make the change and within 14 days of the request will notify Honeywell of any proposed price change on the Product. If Honeywell accepts the new price, Honeywell will notify the Supplier in writing and Supplier will implement the change within a mutually agreed-upon time frame.

5.4    Supplier will continue to make available to Honeywell spare Products ("**Spares**") for a period of 5 years after the date on which this Agreement is terminated. Spares will be provided on mutually agreed upon terms and pricing, substantially equivalent to those set out in this Agreement, and based on a one-time, Last Time Buy Purchase Order, which deliveries may be scheduled over the 5-year term.

5.5    Supplier grants to Honeywell a right of first refusal with respect to each and every proposed Change of Control such that Honeywell may consummate a transaction substantially similar in all material respects to and in lieu of such Change of Control. Supplier must give Honeywell at least 60 days written notice prior to any proposed Change of Control. Such notice must contain all material terms of the proposed Change of Control.

Honeywell Internal

**6.0 PRODUCT LEAD TIME.**

6.1 The time period between Honeywell notification to Supplier of Product requirements and the date Product is available for shipment ("**Lead Time**") will not exceed the lead-times set forth on **Exhibit A**. Honeywell may modify or cancel a Purchase Order for Product if Supplier cannot meet this Lead Time requirement. Supplier will establish a stocking program in accordance with the terms set forth on **Exhibit B**.

6.2 Supplier agrees to work to written forecasts issued by Honeywell upon request ("**Forecasts**") and to manage its build schedule and/or inventory to accommodate fluctuations in the Forecasts to ensure an uninterrupted flow of Products to Honeywell. Forecasts are not purchasing commitments and do not bind or obligate Honeywell in any way.

**7.0 REPORTING; REQUIREMENT TO NOTIFY.**

7.1 Supplier will monitor and report, as required by Honeywell, the following metrics by delivery location: on-time delivery performance, Product volume, backlog reports, defects and defect resolution, lead times, productivity improvements, and other metrics to be mutually defined. Supplier will attend performance reviews at which it will present data regarding its compliance with the terms of this Agreement. Such reviews will be held at a frequency determined by Honeywell, but no more frequently than quarterly.

7.2 As requested by Honeywell, Supplier will provide Honeywell with reports demonstrating Supplier's financial stability that are attested to by an officer of Supplier or an accounting firm representing Supplier and in a mutually agreed format.

**8.0 PRODUCT QUALITY.**

8.1 Supplier will provide Honeywell with proposals for continuous Product quality improvement on an annual basis and Supplier and Honeywell will develop an agreed-upon quality improvement plan. Supplier will have in place a continuous improvement strategy which incorporates measurements and reporting for product cost, quality, delivery and service and will provide documentation relating to the continuous improvement strategy to Honeywell upon request.

8.2 Supplier will investigate and report to Honeywell on the cause of any Product defects within 30 days of knowledge of the defect. The parties will agree on the long and short term solutions Supplier will implement to correct the root cause of the defects. Supplier will provide a Return Material Authorization number within 24 hours of notification of defect by Honeywell.

8.3 Supplier must have the following supply management tools in place: a supplier evaluation tool; a supplier corrective action system; a defect tracking system to identify problem suppliers, commodities and parts; and a receiving inspection plan that verifies that the raw materials and Product parts received by Supplier meet applicable drawings and requirements of this Agreement. Supplier will maintain records demonstrating compliance with this Section during the Term and for 2 years thereafter and will provide such records to Honeywell at any time upon Honeywell's request.

8.4 Prior to shipment, Supplier will test all Products in accordance with mutually agreed testing, measurement and inspection procedures. Honeywell, and its customers, may from time to time attend Supplier's facility to observe or participate in such testing. All Supplier Product test and inspection records will be available to Honeywell at any time during the Term and for 2 years thereafter upon Honeywell's request.

8.5 Supplier will comply with the quality system and quality assurance procedures set forth in **Exhibit C**. If the Products are listed with or it becomes necessary, in Honeywell's sole opinion, to list/certify the Products with any international industrial standards association, Supplier will, at its sole cost, take such actions as are necessary to maintain/obtain such listing/certification at all times. If Supplier fails to pass any audit by such standards association, then Supplier will pay for the re-audit by the applicable standards association. Such re-audit will occur as soon as possible. Supplier is liable for any damages incurred by Honeywell as a result of Supplier's failure to pass such audit and any re-audit. If any materials or component parts that comprise a listed/certified Product are, for any reason, not available and must be replaced by an alternative material or component part, Supplier will pay

for any costs related to relisting/recertifying such Product. Such relisting/recertifying will occur as soon as possible. Supplier is liable for any damages incurred by Honeywell as a result of Supplier's delay in obtaining such relisting/recertification. Supplier will provide Honeywell with at least 90 days written notice prior to the termination of any Product listing/certification.

**9.0    PRODUCTIVITY.**

9.1    Supplier will identify annual productivity gains of a minimum of 1% per year without degradation of Product quality and will pass these productivity gains along to Honeywell in the form of an annual price reduction for Products. This annual price reduction will be reflected in the Product prices in accordance with Section 11.

9.2    Supplier will seek out and advise Honeywell of price reduction opportunities in areas including, without limitation: Supplier-assisted value engineering suggestions and lean enterprise initiatives approved by Honeywell; parts redesigns; material improvements or substitutions; packaging improvements; assembly or processing improvements; process improvements; reductions in cost of poor quality; reductions in transportation costs; tooling improvements or innovation; cycle time or lead time reduction; raw material and component price reductions; negotiated price reductions from Supplier's vendors; or digitization. In addition, Supplier will support any supplier development processes implemented by Honeywell.

9.3    Supplier will submit a quarterly productivity report to Honeywell including status updates on open initiatives and performance results.

**10.0    RIGHT OF AUDIT.**   Honeywell will be entitled to send, at its own expense and on reasonable prior notice, representatives to Supplier's facility to perform Product quality audits, review related documentation, and conduct other business relating to this Agreement. Supplier will provide facility access to Honeywell's representatives and will provide reasonably required documentation to fulfill the purpose of such visits. Honeywell's representatives will abide by Supplier's generally applicable rules and regulations during such facility visits. Honeywell's representatives may include Honeywell's customers and higher tier contractors. Supplier will maintain, and will provide Honeywell upon request with, documentation that authenticates traceability of the manufacturers utilized by Supplier to obtain all Products and Components under any Purchase Order.

**11.0    PRICING.**

11.1    Pricing of Products will be as set forth on **Exhibit A**. These prices include all taxes and other governmental charges and customs duties and are firm for the Term and no surcharges or price changes will be demanded by Supplier or paid by Honeywell. To the extent that value added tax (or any equivalent tax) is properly chargeable on the supply to Honeywell of any Products, Honeywell will pay the tax as an addition to payments otherwise due Supplier under this Agreement, if Supplier provides to Honeywell a value-added tax (or equivalent tax) invoice. To the extent Honeywell has not received from Supplier all applicable forms regarding compliance with applicable tax law, Honeywell reserves the right to deduct from any payment to Supplier pursuant to this Agreement those amounts that Honeywell, in its sole discretion, deems to be required to be withheld in order to comply with the tax laws of any applicable jurisdiction. Supplier will update **Exhibit A** per the productivity-based price reduction required by Section 9.1 throughout the Term. Supplier and Honeywell shall review pricing not less frequently than once per calendar year. Supplier shall make commercially reasonable efforts to reduce pricing to Honeywell. Upon the agreement of the parties to reduced pricing for the Products, such pricing shall immediately apply to all Products in consignment or under a stocking arrangement with Supplier, all undelivered Products, all open and unfilled Purchase Orders, all future Purchase Orders and all unconsumed inventory owned by Honeywell.

11.2    Supplier warrants that the prices charged for the Products delivered under this Agreement are the lowest prices charged by Supplier for similar goods where volume levels are substantially similar to or less than Honeywell's volume. If Supplier charges a lower price for similar goods, Supplier must notify Honeywell and apply that price to all Products ordered under this Agreement. As directed by Honeywell, Supplier will provide the Products at the prices applicable under this Agreement, subject to terms and conditions of this Agreement, to other Honeywell divisions and affiliates and any third-party Honeywell sub-supplier or designee.

11.3    Honeywell may deduct any amount owing from Supplier to Honeywell as a set off against any amount due or owing to Supplier.

11.4    If Honeywell takes measures that result in a decrease in Supplier's cost of raw materials or Product parts, then the Product prices will be decreased in proportion to the cost savings it realizes for the affected Products.

11.5    Payment terms are net 75 days from the later of Honeywell's (a) receipt of a correct invoice and (b) receipt of conforming Products or services; provided, however, that in the event that applicable law requires a payment terms period of shorter duration, payment terms shall be the maximum period allowed by applicable law. Payment of all undisputed amounts will be made in United States Dollars or in such other currency identified on **Exhibit A** for the respective Product and in the first monthly payment cycle following expiration of the net payment term.  Payment of an invoice does not constitute acceptance of the Products shipped or the services rendered, if any.

11.6    After each shipment made or service provided, Supplier will submit to the address indicated on the Purchase Order an invoice listing a description of the Products provided and, as applicable, part numbers, quantity, unit of measure, hours, and the unit and total prices.  This invoice must match the corresponding Purchase Order pricing, quantities, and terms, and must be sent to the invoice address listed on the Purchase Order.  All applicable taxes and other Government charges including, but not limited to, sales, use, or excise taxes, value added tax, customs duties, fees and all incidental charges including but not limited to royalties, selling commissions, nonrecurring engineering, or other incidental charges must be separately itemized and identified on the invoice.  The invoice must also include the following information in English, or in the destination country's official language if required: (a) name and address of Supplier and the Honeywell entity purchasing the Products; (b) name of shipper (if different from Supplier); (c) Honeywell's Purchase Order number(s); (d) country of export; (e) detailed description of the Products; (f) Harmonized Tariff Schedule number; (g) country of origin (manufacture) of the Products, or if multiple countries of origin, the country of origin of each part shipped; (h) weights of the Products shipped; (i) currency in which the sale was made; (j) payment terms; (k) shipment terms used; and (l) all rebates or discounts. The invoice will be accompanied (if applicable) by a signed bill of lading or express receipt evidencing shipment.

**12.0    DELIVERY, PACKING AND SHIPPING.**

12.1    TIME IS OF THE ESSENCE.  Supplier will maintain an on-time delivery performance of 100% to agreed locations and times.  Honeywell reserves the right to change delivery schedules and temporarily suspend scheduled shipments, beyond the replenishment lead time of 5 business days.  Honeywell may schedule delivery, at no extra cost to Supplier, during weekends, or outside of normal business hours, unless the delivery is due to a late shipment by Supplier, in which case the additional costs shall be borne by the Supplier.  Honeywell may return or store at Supplier's expense any Products delivered more than 5 days in advance of the specified delivery date.  Honeywell reserves the right to reject, at no expense to Honeywell, all or any part of any delivery that varies from the quantity authorized by Honeywell for shipment.  Honeywell reserves the right to pursue additional remedies caused by delayed or missed delivery, including but not limited to incremental freight expenses incurred by Honeywell for shipments of Products to Honeywell.  Supplier will not make any substitutions without Honeywell's prior written approval.  Honeywell will not be liable for any discharge, spill or other environmental incident or condition (including clean-up costs) involving any Products shipped under this Agreement unless caused by Honeywell and in no event until delivery to the destination designated by Honeywell.  All containers will be properly marked for identification as instructed on Honeywell's Purchase Order and contain a packing slip that details, at a minimum, the Honeywell Purchase Order number(s), product part number, detailed product description, country of origin, total number of boxes in shipment, quantity of product shipped, and final delivery address.  Items shipped in advance of Honeywell's delivery schedule may be returned at Supplier's expense.  For domestic shipments, if requested by Honeywell, and for all international shipments, Supplier will give notice of shipment to Honeywell when the Products are delivered to a carrier for transportation. The Purchase Order number(s) must appear on all correspondence, shipping labels, and shipping documents, including all packing sheets, bills of lading, and air waybills.  Within one business day after Supplier delivers the Products to the carrier or at such earlier time as Honeywell may request, Supplier will send Honeywell a complete set of shipping documents including but not

limited to the commercial invoice, packing list, and air waybill, or three original parts of the combined through-bill of lading, clean without notation, necessary to release the Products to Honeywell's custody.

12.2 Unless otherwise specified on the face of the Purchase Order or in a separate signed agreement, all Products will be shipped (domestically and internationally) using Honeywell's preferred carriers on a collect basis. For domestic purchases within the U.S., all shipments are F.O.B. (Uniform Commercial Code) Supplier's Dock unless otherwise specified on the face of the Purchase Order or in a separate signed agreement, and title to Products passes to Honeywell upon delivery of the Products at Supplier's Dock. In all other cases, unless otherwise specified on the face of the Purchase Order or in a separate signed agreement, (a) Supplier will deliver the Products Ex Works (INCOTERMS 2010), and (b) title to Products passes to Honeywell upon delivery of the Products by or on behalf of Supplier at Supplier's Dock.

12.3 Notwithstanding the foregoing, title and risk of loss to Products subject to a consignment, stocking or other replenishment agreement pass upon release of the Products from consigned inventory or at such other time set forth in such consignment, stocking or other replenishment agreement. Honeywell may direct Supplier to ship the Products to Honeywell or to any third party designated by Honeywell.

12.4 No extra charges of any kind, including charges for storage, boxing, packing, loading, bracing, cartage, insurance or taxes, will be imposed by Supplier. Supplier will pack all Products in accordance with best commercial practices. Supplier will mark containers with information as required by Honeywell.

**13.0 INSPECTION.** Final inspection and acceptance by Honeywell will be at destination unless otherwise specified in a Purchase Order. Honeywell may inspect all or a sample of Products, at its option, and may reject all or any portion of the Products within 60 days of delivery if Honeywell determines them to be the Products are defective or nonconforming. If Honeywell performs any inspection (other than the standard inspection) after discovering defective or nonconforming Products, any additional inspection costs will be paid by Supplier. No inspection, tests, approval, or acceptance of the Products will relieve Supplier from responsibility for any defects in the Products or other failure to meet the requirements of a Purchase Order, or for defects (latent or otherwise), fraud, such gross mistakes as amount to fraud, or Supplier's warranty obligations. Honeywell reserves the absolute right to refuse acceptance of, or reject and return to Supplier at Supplier's sole cost and expense any material, Products that fail to conform to any applicable laws or regulations, or for which Supplier fails to package, ship, label or provide proper notice to Honeywell as required by any applicable law or regulation. If Products are defective or nonconforming, Honeywell may, by written notice to Supplier: (a) rescind this Purchase Order as to the Products; (b) accept the Products at an equitable reduction in price; or (c) reject the Products and require the delivery of replacements. Delivery of replacements will be accompanied by a written notice specifying that the Products are replacements. If Supplier fails to deliver required replacements promptly, Honeywell may: (1) correct any retained defective or nonconforming Products at Supplier's expense; (2) replace them with Products from another supplier and charge the Supplier the cost thereof, including cover, and any incidental costs; or (3) terminate this Purchase Order for cause.

**14.0 TOOLING; HONEYWELL-SUPPLIED EQUIPMENT**.

14.1 All Honeywell supplied tooling, equipment or property and all tooling and property paid for by Honeywell, including the tooling listed on **Exhibit D**, is owned solely by Honeywell, including all intellectual property rights ("**Tooling**"). All Tooling is subject to the provisions of **Exhibit D**.

14.2 Without limiting the generality of Section 14.1 hereof, title to any Tooling, material, components, equipment, or technical data that Honeywell pays for or provides to Supplier or is responsible for providing to Supplier, including replacements ("**Honeywell Property**"), will remain or vest with Honeywell. Supplier will conspicuously label Honeywell Property as such, maintain it in good condition, keep written records of the Honeywell Property in its possession and the location of the property, not allow any liens to be placed upon it, and not change its location without prior written approval from Honeywell. Supplier is responsible for inspecting and determining that the Honeywell Property is in useable and acceptable condition. Supplier will use Honeywell Property exclusively to fulfill Supplier's obligations under this Agreement unless otherwise authorized in writing by Honeywell's procurement representative. Honeywell Property is intended for use at the Supplier's site only or as otherwise

authorized in writing by Honeywell's procurement representative and, to the extent applicable, is subject to U.S. and other government export or re-export requirements. Supplier is responsible for any loss, damage, or destruction of Honeywell Property and any loss, bodily injury, damage or destruction resulting from Supplier's use of Honeywell Property. Supplier will not include the cost of any insurance for Honeywell Property in the prices charged under this Agreement and, to the extent that any Products contain any Honeywell Property, will not include in the price of any such Product any mark-up or fee with respect to such Honeywell Property. Supplier will return Honeywell Property or dispose of it as Honeywell directs in writing. Honeywell makes no representations and disclaims all warranties (express or implied) with respect to Honeywell Property.

**15.0    IP LICENSE.**

15.1    Supplier grants to Honeywell a nonexclusive, nontransferable, worldwide, fully paid-up, perpetual, irrevocable license to directly and indirectly, use, distribute, import, export, display, and perform all intellectual property incorporated into the Products, or necessary or incidental to use the Products purchased under this Agreement ("**IP**").

15.2    Intentionally Omitted

**16.0    WARRANTIES.**

16.1    Supplier warrants to Honeywell, its successors, assigns, customers, and end users that for a period of 24 months from the date of first use the Products (including all replacement or corrected Products or components and regardless of whether all or any part of such furnished Products or any replacement or corrected Products was manufactured, distributed or otherwise commercialized by a third party prior to delivery by or on behalf of Supplier to Honeywell) will: (a) be new, free from defects in workmanship, and materials except to the extent that such Products comply with detailed designs provided by Honeywell; (b) conform to applicable drawings, designs, quality control plans, specifications and samples and other descriptions furnished or specified by Honeywell, including meeting the specifications set forth on **Exhibit A**; (c) not be or contain Counterfeit Items (as defined below), (d) be and only contain materials directly obtained from the original equipment manufacturer ("**OEM**") or a reseller authorized by the OEM, (e) be merchantable; (f) be fit for the intended purposes and operate as intended; (g) comply with all laws and regulations; (h) be free and clear of any and all liens or other encumbrances; (i) contain only authentic, unaltered OEM labels and markings; (j) not infringe any patent, published patent application, or other intellectual property rights of any third party and not utilize misappropriated third party trade secret information; and (k) meet the other requirements of a Purchase Order. "**Counterfeit Items**" mean Components (as defined below), Products and software incorporated in a Product or Component that (i) are unauthorized copies or substitutes of an OEM item; (ii) are not produced in accordance with, or do not contain the proper materials or components as specified on, the OEM's specifications or design; (iii) are used, refurbished, or reclaimed, but which are represented as being new; or (iv) are labeled, logoed or marked to mislead or deceive a reasonable person into believing a non-OEM item is genuine. To the extent that any Product contains any input, component or service that is warranted by a third party that has provided such input, component or service to Supplier, Supplier shall take all actions necessary to cause Honeywell, any Honeywell business unit, Honeywell subsidiary, and any Honeywell customer or other designee to be a third-party beneficiary of such warranty, it being acknowledged by Supplier that the foregoing third-party warranty shall be in addition to, and not in lieu of, all other warranties provided by Supplier in this Agreement. These warranties, and all other warranties, express or implied, will survive delivery, inspection, acceptance, and payment. Supplier must obtain third party warranties consistent with Section 16 for all raw materials, components, and services required by Supplier to perform under this Agreement ("**Components**") and Supplier is solely responsible for ensuring that all Components meet these requirements. Any Component that fails to meet these requirements will be deemed to be a non-conforming Product. Supplier will promptly notify Honeywell in writing upon Supplier discovering that it has, or suspects that it may have, delivered a non-conforming Product or Counterfeit Item.

16.2    Regarding software Products and software embedded in Products, Supplier warrants that:

(a)     There are no copy protection or similar mechanisms which will, either now or in the future, interfere with the license grants made in this Agreement and Supplier has not and will not make commitments to other parties which conflict with this Agreement;

(b)     Supplier has used the latest technology to test the software and such tests have not revealed the presence of any malicious code, program or other internal component (e.g., computer virus, computer worm, computer time bomb, or similar component) which could damage, destroy, or alter software, firmware or hardware, or which could, in any manner, reveal, damage, destroy or alter any data or other information accessed through or processed by the software;

(c)     The software does not infringe on another's patent, copyright, trademark or trade secret;

(d)     With respect to licensed software to which Supplier does not have title, Supplier has a license sufficient to permit the license thereof to Honeywell pursuant to this Agreement;

(e)     Identified Software, as thereinafter defined, in the Products or any licensed software is set forth on **Exhibit E**. "**Identified Software**" is defined as software which is licensed pursuant to terms that directly or indirectly: (a) create, or purport to create, obligations for Honeywell with respect to any Honeywell intellectual property, or (b) grant, or purport to grant, to any third party any rights or immunities to the intellectual property or proprietary rights in any software or other intellectual property products which may be used in conjunction with the Products. Identified Software includes without limitation any open source software and any software that requires, as a condition of use, modification and/or distribution of such software that other software incorporated into, derived from or distributed with such software (x) be disclosed or distributed in source code form; (y) be licensed for the purpose of making derivative works; or (z) be redistributable at no charge;

(f)     For any use of open source software ("**Open Source Software**"), including but not limited to any "copyleft" software, such as that licensed pursuant to the GNU General Public License ("**GPL**") or the lesser or library GPL ("**LGPL**"), by Supplier in connection with Products, Supplier shall provide the source code (with modifications, if any) for such software. Supplier represents and warrants that such Open Source Software will not contain any components that are licensed under any license terms or other contract terms ("**Open License Terms**") which require, as a condition of use, modification, or distribution of such software or any other software incorporated into, derived from, distributed with, or incorporating such software ("**Derivative Software**") any of the following: (a) that the source code of such software or any Derivative Software be made available to third parties; (b) that permission for creating derivative works of such software or any Derivative Software be granted to third parties; or (c) that a royalty-free license be granted to third parties under any intellectual property rights contained in the software or any Derivative Software. By means of example and without limitation, Open License Terms include the following licenses or distribution models: the GPL, the LGPL, or any similar open source, free software, or community licenses. Supplier shall indemnify and hold harmless Honeywell for all damages, costs, expenses, claims, liabilities, and the like (including reasonable attorney's fees and expenses) resulting from any breach of this section; and

(g)     Supplier hereby represents and warrants that it has taken all action required by the licenses for the Identified Software set forth on **Exhibit E**, including complying with all requirements of any applicable license for the Identified Software. Supplier will indemnify Honeywell for any costs, expenses, claims, or liabilities relating to or arising out of any failure to comply with such applicable license terms or with the incorporation of any Open Source Software into Products, and Supplier will comply with all requirements imposed upon it by any license agreement relevant to any Open Source Software included in the software or Products provided to Honeywell. Supplier further represents and warrants that all such licenses have been made available to Honeywell and are available electronically at a location set forth on **Exhibit E**.

16.3     If Products are found not to be as warranted in Section 16.1. 16.2 or 16.7, Honeywell may return such Products to Supplier, at Supplier's expense, for correction, replacement, or credit, as Honeywell may direct. Any Products corrected or furnished in replacement will, from the date of delivery of such corrected or replacement Products,

be subject to the provisions of this Section 16.3 for the same period and to the same extent as the Products initially furnished.

16.4    As to any services provided in connection with the Products, Supplier warrants that it possesses the requisite expertise, facilities and equipment necessary and appropriate to perform the services, and that all services will be performed in a safe and workmanlike manner. In addition to any other rights Honeywell may have, if the services are found not to be performed as warranted within a period of 1 year after the conclusion of the performance of the services by Supplier, Supplier will, at Honeywell's option, either refund to Honeywell the amount paid for the services, or perform the services again in a proper manner to the extent necessary to provide Honeywell with the result originally contemplated by Honeywell.

16.5    Supplier will furnish, upon Honeywell's request, lien waivers by Supplier and all other persons or entities entitled to assert any lien rights in connection with the performance of this Agreement.

16.6    If more than 1% of any batch of Products or of the aggregate Products sold and delivered to Honeywell exhibit the same failure to conform to the applicable specifications or contain the same defects in material or workmanship, then an "**Epidemic Failure**" shall be deemed to have occurred.  Upon receipt of written notice from Honeywell to Supplier of any Epidemic Failure, Supplier shall promptly review the failed Products and data to determine if such Epidemic Failure is due to a common root defect in Supplier's material or workmanship.  Supplier shall provide an 8D analysis within 48 hours of written notification of any such Epidemic Failure.  A Supplier Corrective Action Report, (**"SCAR"**) may also be required.  If such a determination is made, Supplier shall develop a plan to eliminate the problem in all continuing production and to correct the problem in all affected units of Product previously sold and delivered to Honeywell.  Supplier shall submit such plan to Honeywell for Honeywell's approval, such approval not to be unreasonably withheld.  Upon receiving Honeywell's approval, Supplier shall implement the corrective action, at its expense, including correction of the problem in all affected units of Product and reimbursement of Honeywell's costs associated with such problem, as provided in the corrective action plan.

16.7    Products covered by this Agreement will comply with all applicable treaties, laws, regulations of the place of manufacture and Canadian, European Union and U.S. state and federal laws, regulations and standards (a) concerning the importation, sale, design, manufacture, packaging and labeling of its Products, (b) regulating the sale of Products, and (c) relating to the environment and/or the toxic or hazardous nature of Products or their constituents, including (without limitation) the U.S. Toxic Substances Act, the U.S. Occupational Safety and Health Act, the U.S. Hazardous Communication Standard, the Federal Hazardous Substances Act, the California Proposition 65, European RoHS standards, and other current and subsequently applicable requirements; and Supplier agrees that it shall furnish promptly on request and provide all information and certifications evidencing compliance with such laws, regulations, standards and requirements.

16.8    Supplier represents and warrants that it is under no obligation or restriction, nor will it assume any such obligation or restriction that does or would in any way interfere or conflict with, or that does or would present a conflict of interest concerning, the work to be performed for Honeywell under this Agreement

**17.0    INTELLECTUAL PROPERTY.**

17.1    Honeywell and Supplier, each and severally, retains exclusive ownership to all IP Rights relating to the Products supplied by a Party.  "**IP Rights**" means design and manufacturing specifications, technical information, know-how, ideas, concepts, processes, procedure, designs, schematics, works of authorship, inventions, software, discoveries, and all intellectual property rights worldwide arising under statutory or common law or by contract and whether or not perfected, pending, now existing or hereafter filed, issued or acquired, including all patent rights; rights associated with works of authorship including copyrights and mask work rights; rights relating to the protection of trade secrets and confidential information; and any right analogous to those set forth herein.  This agreement shall not act to transfer any IP Rights.

17.2    Upon request, Supplier will notify Honeywell of any IP Rights owned or licensed by Supplier or third parties that apply to the Products or any parts thereof.  Honeywell will not be required to pay royalties or any other sum for IP Rights owned or licensed by Supplier in connection with the Products.

17.3 If Supplier becomes aware that Products potentially infringe a third party's IP Rights, Supplier will promptly notify Honeywell, provide all requested assistance concerning the potential infringement, and comply with its obligations under Section 18.2.

**18.0 LIABILITY AND INDEMNIFICATION.**

18.1 Supplier will, at its expense, defend, hold harmless and indemnify Honeywell and its customers, subsidiaries, affiliates, and agents, and their respective officers, directors, shareholders, and employees, (collectively "**Indemnitees**") from and against any and all loss, cost, damage, claim, demand, penalty, or liability, including reasonable attorney and professional fees and costs, and the cost of settlement, compromise, judgment, or verdict incurred by or demanded from the Indemnitee ("**Loss**") arising out of, resulting from or occurring in connection with Supplier's Products or the performance of services by Supplier or its personnel (including any employment-related Loss arising out of, resulting from or occurring in connection with the performance), the acts, omissions, negligence or willful misconduct of Supplier or its personnel, Supplier's breach of the terms of this Agreement, or any theft or other misappropriation of Honeywell's or its personnel's information, property or funds by Supplier or its personnel. Indemnitees may participate in the defense and negotiations to protect their interests. Supplier will not enter into any settlement or compromise without Honeywell's prior written consent, which will not be unreasonably withheld.  If Honeywell is obligated to pay any Loss or any damages pursuant to its contract with a customer, then Supplier will be liable for such Loss any damages to the extent Supplier causes or contributes to such Loss or any damages.  Furthermore, in the event a recall or other corrective action relating to Supplier's Products is necessitated by a defect or a failure to conform to any laws, regulations or specifications, Supplier shall bear all costs and expenses of such recall or other corrective action, including without limitation, costs of notifying customers, customer refunds, cost of returning goods, and other expenses incurred to meet obligations to third parties.  Nothing in this Section limits Honeywell's right to claim all actual damages sustained by Honeywell as a result of Supplier-caused delays.

18.2 For Products provided under this Agreement, Supplier will, at its expense, defend and indemnify each Indemnitee from and against any and all loss, cost, damage, claim, penalty, or liability, including reasonable attorney and professional fees and costs, and the cost of settlement, compromise, judgment, or verdict incurred by or demanded from any Indemnitee arising out of, or relating to any alleged or actual: (a) patent, copyright, or trademark infringement; (b) unlawful disclosure, use, or misappropriation of a trade secret; or (c) violation of any other third-party intellectual property right, and from expenses incurred by any Indemnitee in defense of such suit, claim, or proceeding if Supplier does not undertake the defense thereof.  Supplier will not enter into any settlement without Honeywell's prior written consent, which will not be unreasonably withheld.  Any Indemnitee may participate in the defense or negotiations to protect its interests.  If any injunction or restraining order is issued, Supplier will, at Honeywell's option and Supplier's expense, obtain for an Indemnitee either the right to continue using and selling the Products or replace or modify the Products to make them noninfringing; without any loss of functionality.

18.3 If Products are defective or fail to meet specifications, Supplier will use commercially reasonable efforts to assist Honeywell in implementing corrective action with respect to such defects or failure.  These efforts include, without limitation, increasing manufacturing volumes by adding shifts and machine capacity at Supplier's expense, and implementing Product changes requested by Honeywell as quickly as possible.  In addition to any other remedies that may be available to it, Honeywell may charge, and Supplier agrees to pay, costs, penalties, fees and expenses associated with administering, handling and processing any late delivery or any delivery of non-conforming Products to Honeywell.

**19.0 CONFIDENTIALITY.**

19.1 "**Confidential Information**" means any written or machine-readable information (or oral information reduced to writing or summarized in writing) that the disclosing party considers proprietary or confidential and marks as "confidential", "proprietary", "sensitive" or with words of similar meaning.   All documentation containing specifications, Product designs or Product-specific information provided to Supplier by Honeywell are Confidential Information whether or not so marked.   The parties may exchange Confidential Information during the

Honeywell Internal

performance or fulfillment of this Agreement. All Confidential Information will remain the property of the disclosing party and will be kept confidential by the recipient for a period of ten (10) years following the date of disclosure. Neither party will use Confidential Information received from the other party to compete with the other party or for any purpose other than the fulfillment of this Agreement. Software will be kept confidential perpetually. These obligations will not apply to information which is: (a) publicly known at the time of disclosure or becomes publicly known through no fault of recipient; (b) known to recipient at the time of disclosure through no wrongful act of recipient; (c) received by recipient from a third party without restrictions similar to those in this section; or (d) independently developed by recipient. Each party will retain ownership of its Confidential Information, including without limitation all rights in patents, copyrights, trademarks, trade secrets and any other intellectual property rights. Each party hereby grants to the other party a non-exclusive license to use its Confidential Information disclosed in connection with this Agreement solely for performance of the recipient's obligations under this Agreement. Except as expressly authorized under this Agreement, no party may transfer or disclose Confidential Information or assign its rights or obligations under this Section without the prior written consent of the disclosing party. All other transfers or assignments shall be null and void.

19.2  The parties acknowledge that damages for violation of the confidentiality obligations of this Section 19 may be inadequate, and the parties agree that injunctive relief for any breach of this Agreement by the recipient of Confidential Information may be had in addition to any other remedies available.

19.3  Upon termination of this Agreement or upon request of the disclosing party, whichever occurs first, the recipient will promptly return to the disclosing party all Confidential Information received under this Agreement, together with any and all copies thereof, or, if disclosing party so requests, the recipient will destroy all such Confidential Information and provide the disclosing party with a written certification of the destruction.

19.4  Supplier will not publicly announce or disclose the existence of this Agreement or its terms and conditions, or advertise or release any publicity regarding this Agreement without the prior written consent of Honeywell. Furthermore, Supplier will not claim or suggest, implicitly or explicitly, that Honeywell's purchase of its Products use of its services or deliverables constitutes Honeywell's endorsement of its Products, services or deliverables.

19.5  In the event that the parties to this Agreement have entered into a non-disclosure agreement prior to the Effective Date, such non-disclosure agreement is incorporated herein by reference and, notwithstanding any other provisions to the contrary within such non-disclosure agreement, will remain in full force and effect throughout the term of this Agreement.

19.6  "**Personal Data**" means any information relating to an identified or identifiable natural person; an identifiable person is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his physical, physiological, mental, economic, cultural or social identity. The Parties agree that they will treat any Personal Data of all officers, directors, employees, agents, contractors, customers, and suppliers that is received under this Agreement as Confidential Information. The Parties agree that the Supplier will be the Data Processor (as defined in the EU Data Protection Directive 95/46/EC or any successor Directive) for the purposes of processing Personal Data pursuant to this Agreement. Supplier will: (a) take appropriate technical and organizational security measures as are reasonably required by Honeywell to protect Personal Data; (b) use and permit employees and third parties to use Personal Data pursuant to Honeywell's instructions only for purposes directly related to the provision of Products or performance of services or related obligations under this Agreement; (c) refrain from transferring Personal Data out of the European Union unless Honeywell has given its prior written consent to the transfer and Supplier has satisfied any further requirements reasonably imposed by Honeywell. If with Honeywell's prior permission Supplier will process Personal Data that Honeywell transfers from any of its affiliates in the European Union to any of its affiliates in the U.S. pursuant to the U.S. - EU Safe Harbor Framework ("**Safe Harbor Personal Data**"), Supplier warrants that either Supplier self-certifies to the U.S. – EU Safe Harbor Framework with respect to the processing of the Safe Harbor Personal Data and will notify Honeywell immediately if its self-certification terminates for any reason, or Supplier must provide at least the same level of privacy protection as required by the U.S. – EU Safe Harbor Framework; (d) indemnify Honeywell against all losses, costs, expenses, damages,

liabilities, demands, claims, actions or proceedings which Honeywell may suffer or incur arising out of any breach of this Section; and (e) promptly notify Honeywell about: any legally binding request for disclosure of Personal Data by a law enforcement agency (unless otherwise prohibited); any accidental or unauthorized processing of Personal Data; and any requests received from individuals to whom Personal Data relates, without responding to that request unless it has been otherwise authorized to do so by Honeywell. With the exception of Personal Data, this Agreement imposes no obligation upon Supplier if Supplier can demonstrate that the Confidential Information: (a) was rightfully in Supplier's possession before receipt from Honeywell and was not accompanied by a duty of confidentiality; (b) is or becomes a matter of public knowledge through no fault of Supplier; (c) is rightfully received by Supplier from a third party and is not accompanied by a duty of confidentiality; (d) is disclosed by Honeywell to a third party without a duty of confidentiality on the third party; (e) is independently developed by Supplier without use of Honeywell's Confidential Information; or (f) is disclosed under operation of law, provided Supplier notifies Honeywell and upon Honeywell's request and at Honeywell's cost cooperates in all reasonable respects to contest the disclosure or obtain a protective order or other remedy.

**20.0 TRADEMARK.** Honeywell will have the right to market the Products under its own trademark, trade name or product designation. Supplier will not use any trademark or trade names of Honeywell without (a) first obtaining Honeywell's written permission, and (b) entering into a trademark license agreement as set forth in **Exhibit F** to this Agreement.

**21.0 OFFSET; DRAWBACK.**

21.1 Supplier will assist Honeywell in obtaining credit from Supplier's government for the value of Products or related services purchased hereunder to meet any present or future contractual offer or industrial benefit requirements imposed upon Honeywell or its subsidiaries or affiliates, if any. Honeywell reserves the right to claim these credits on behalf of itself or its customers, suppliers or other third parties. If Supplier awards a portion of the work hereunder to a supplier, Supplier will assign to Honeywell any credits obtained from the supplier's government, if any, relating to the transaction and will assist Honeywell in obtaining those credits.

21.2 To the extent applicable to any shipment of Products to Honeywell or Honeywell's designee, all drawback of duties, and rights thereto, related to duties paid by Supplier or Honeywell when the Products are imported or any materials or components used in manufacturing of the Products will accrue to the exclusive benefit of Honeywell. Duty drawback rights include rights developed by substitution and duty drawback rights obtained from sub-tier suppliers related to the Products. Supplier will provide Honeywell with all documents, records, and other supporting information necessary to obtain any duty drawback, and will reasonably cooperate with Honeywell to obtain payment.

**22.0 COMPLIANCE WITH LAWS; INTEGRITY.**

22.1. Supplier and its employees, agents, representatives and subcontractors will comply with all laws, regulations and ordinances and Honeywell's Code of Business Conduct ("**Code**") in performing this Agreement. A copy of the Code may be obtained at http://honeywell.com/About/Pages/code-of-business-conduct.aspx. Supplier agrees to abide by and maintain an integrity and compliance program that encompasses at a minimum the standards of business conduct set forth in the Code and that effectively prevents and corrects ethical violations and maintains compliance with laws. Supplier and its employees, agents, representatives and subcontractors have not made or received, and will not make or receive, directly or indirectly, any payments, loans, gifts, favors or other special consideration or form of compensation (a) to or from Honeywell, to its employees, agents or representatives, other than payments set forth in this Agreement or other written contractual agreement between Supplier and Honeywell; or (b) to or from any third party for the purpose of influencing the performance by Supplier or Honeywell of its respective duties hereunder. Supplier must have a management system dedicated to compliance with applicable environmental, health and safety laws and regulations to ensure a safe working environment for its employees and responsible care of materials to prevent a negative impact on the environment (for example: ISO14001:2004/OHAS 18001:2007).

22.2. Upon request, in form and substance satisfactory to enable Honeywell to meet its compliance obligations with regard to Regulation (EC) No 1907/2006 ("**REACH**"), Supplier will provide Honeywell with complete information regarding the chemical composition (substances, preparations, mixtures, alloys or goods) of any Products supplied under this Agreement, including all safety information required under REACH and information regarding the registration or pre-registration status of any Deliverables pursuant to REACH promptly but no later than 45 days of receiving such request. Supplier agrees that it will include any Honeywell "Identified Use" in its REACH registrations or applications for Authorization, unless Supplier notifies Honeywell that it rejects the Identified Use in order to protect human health or the environment and specifies the reason for the rejection. In this case Honeywell will have the right to terminate this Agreement without incurring any damages.

22.3. Absent Honeywell's prior written consent, no Products will contain any of the substances identified in (a) Article 4(1) of the European Parliament Directive 2011/65/EU (the "**RoHS Directive**") as the RoHS Directive may be updated from time to time and as such Directive is implemented in any country, but only to the extent that the Directive applies to the commercialization, sale or use of such Products, or (b) similar applicable laws or regulations (including, without limitation, the United States Department of Transportation and California Proposition 65), restricting the use of hazardous materials in such other jurisdictions to the extent that any such law or regulation applies to the commercialization, sale or use of such Products. If such prior written consent is given, then Supplier shall inform Honeywell in writing of same, and properly warn, label, package and ship such hazardous materials in accordance with all applicable laws and regulations. Further, prior to shipment and upon request, Supplier shall identify and provide to Honeywell compliant material safety data sheet information and RoHS Directive information for covered Products.

22.4. Products will not include any of the restricted chemicals set forth in the Montreal Protocol on ozone-depleting substances. Supplier will avoid use of materials of concern in the Products provided to Honeywell, including but not limited to Persistent, Bioaccumulative Toxic (PBT) substances, Persistent Organic Pollutants (POPs) (e.g. PCBs, mercury, certain insecticides-DDT, chlordane etc.), carcinogens (known or suspected), mutagens, radioactive materials, reproductive toxins (known or suspected), beryllium, hexavalent, chromium, asbestos or other respirable fibers, ozone depleting substances, brominated flame retardants or nanoparticles. Supplier will proactively inform Honeywell of any above listed substances content in any Products supplied under a Purchase Order.

22.5. If applicable, Supplier will be responsible for all costs and liabilities for or relating to the disposal and/or recycling of materials, waste and Products.

22.6. All Products conform to all applicable European Union harmonization legislations relating to products which are intended to be placed on the market in the European Economic Area including, without limitation, CE marking Directives and Directives, as such directives are updated from time to time and enacted by the national laws ("**EU Harmonization Legislation**"). Supplier will ensure that the Products have been designed and manufactured in accordance with the requirements of the EU Harmonization Legislation. Supplier will, at its cost, take all measures necessary to ensure that the design and manufacturing processes assure compliance of the Products.  As Honeywell may be considered a manufacturer of the Products for the purposes of certain Directives of the EU Harmonization Legislation, Supplier expressly agrees, at its cost, to assist Honeywell with fulfilling the obligations of a manufacturer under said Directives.

22.7 <u>US Equal Employment Opportunity Regulations</u>. To the extent employment activities of Supplier occur in the United States and if otherwise applicable **this contractor and subcontractor shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability.**

22.8. In accordance with applicable "Conflict Minerals" laws, Honeywell must determine whether its products contain tin, tantalum, tungsten or gold ("**3TG**") originating in the Democratic Republic of the Congo and adjoining

countries ("**Conflict Minerals**"). To the extent Supplier supplies Products containing 3TG to Honeywell under this Agreement or any Purchase Order, Supplier commits to have a supply chain process to ensure and document a reasonable inquiry into the country of origin of the 3TG minerals incorporated into such Products. If requested, Supplier will promptly provide information or representations that Honeywell reasonably believes are required to meet its conflict minerals compliance obligations.

22.9    To the extent deemed applicable by Honeywell, Supplier will also comply with Honeywell's (a) Information and System Security Supplier Terms and Conditions and (b) Product Security Terms and Conditions.

22.10   Supplier will implement the Business Partner Criteria of any Supply Chain Security Program that the country of import for the Products may adopt such as the U.S. Customs-Trade Partnership Against Terrorism (C-TPAT) or the Canadian Partners in Protection (PIP) Program.

22.11   The parties agree that Supplier will perform its obligations under this Agreement as an independent contractor. Supplier will be solely responsible for all Employer Obligations with respect to Supplier personnel, even if a court or other body deems the personnel to be Honeywell employees. "**Employer Obligations**" means all obligations of any kind imposed customarily or by law or agreement on persons acting in the capacity of an employer, including, without limitation, responsibility for (a) hiring, assigning, compensating, and terminating personnel; (b) withholding and paying taxes; (c) verification of employment eligibility, including compliance with work authorization and immigration laws and export licensing and control requirements; (d) compliance with all federal, state, and local laws (both common and statutory) and regulations related to employment and the rights of personnel. Supplier represents and warrants that it and all its subcontractors, if any, comply and will continue to comply with all applicable employment laws and regulations related to personnel working on Honeywell matters, that all personnel working on Honeywell matters are authorized to work in the relevant jurisdiction, and that it does not employ child or forced labor.

**23.0    INSURANCE.**   Supplier will maintain and carry liability insurance in an amount no less than the greater of (a) the minimum amount required by applicable law, or (b) the following coverages: commercial general liability (including product liability and, for services to be performed, completed operations liability) in a sum no less than $5 million, automobile liability in a sum no less than $5 million, worker's compensation in an amount no less than the applicable statutory minimum requirement, and employer's liability in an amount of no less than $1 million, all with insurance carriers with an AM Bests rating of no less than A or equivalent.   Prior to commencing performance under this Agreement, Supplier will furnish valid Certificates of Insurance to Honeywell evidencing the insurance required herein.   Each Certificate of Insurance will provide that 30 days prior written notice must be given to Honeywell in the event of cancellation or material change of insurance coverage and must contain the following endorsements:  (x) Honeywell is named as an additional insured on each of the liability insurance policies except Worker's Compensation; (y) the insurance carrier extends the coverage to include the contractual liability of Supplier arising by reason of the indemnity provisions of this Agreement; and (z) the insurance carrier waives all rights of subrogation against Honeywell.   For avoidance of doubt, the limitations of liability set forth in this Agreement will not be construed to limit Honeywell's right to pursue claims payable under this Section.

**24.0    MISCELLANEOUS.**

24.1    This Agreement, together with any previously executed agreement(s) pertaining to confidentiality and/or non-disclosure, constitutes the entire agreement of Honeywell and Supplier regarding the subject matter hereof, superseding all prior agreements or understandings, written or oral and it may not be modified, extended, canceled or rescinded except in a writing signed by the parties which expressly references this Agreement.  This Agreement does not affect the rights and obligations which have accrued under any prior agreements with respect to the performance or nonperformance thereof. Supplier shall not assign this Agreement or any interest therein nor subcontract any work under any Purchase Order.  No representation, warranty, course of dealing, or trade usage not contained or expressly set forth herein will be binding on with party. Headings and captions are for convenience of reference only and do not alter the meaning or interpretation of these terms and conditions.  No failure or delay by either party to enforce at any time for any period the provisions hereof shall be construed as a waiver of such provision or of the right of such party to enforce thereafter each and every provision. In the event

DocuSign Envelope ID: A3118D0C-9FC9-4B01-B5FB-05DB6D6BD659

any provision herein is determined to be illegal, invalid, or unenforceable, the validity and enforceability of the remaining provisions shall not be affected and, in lieu of such provision, a provision as similar in terms as may be legal, valid, and enforceable shall be added hereto. Neither party will be liable for failure to perform any of its obligations under this Agreement due to a force majeure event and which are unforeseeable; provided that the party delayed immediately notifies the other party and will use its best efforts to mitigate the effects of the delay and to remedy the delay if it can be remedied. If Supplier's performance is delayed, Honeywell may terminate this Agreement or any Purchase Order upon 2 days prior written notice. If Supplier cannot deliver Products because of a force majeure condition, Honeywell may immediately seek substitute performance. All remedies set forth in this Agreement are in addition to, and will in no way limit, any other rights and remedies available at law or in equity. Nothing in this Agreement will be construed to place Supplier and Honeywell in an agency, employment, franchise, joint venture, or partnership relationship. Neither party has the authority to obligate or bind the other in any manner, and nothing contained in this Agreement will give rise or is intended to give rise to rights of any kind to any third parties. Neither party will make any representation to the contrary. This Agreement may be signed in one or more counterparts (including faxed or electronically scanned copies), each of which will be deemed one and the same original. Reproductions of this executed original (with reproduced signatures) will be deemed to be original counterparts of this Agreement.

24.2 All notices, requests, demands and other communications under this Agreement must be in writing and will be deemed to have been duly given (a) on the date of service if served personally on the party to whom notice is to be given, (b) on the first business day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service, properly addressed, to the party as follows:

| Honeywell | Supplier |
| --- | --- |
| Name: Lance Gifford | Name: Jim Rideout |
| Title: NPI Procurement Lead, High Risk Safety | Title: Western District Manager, |
| Phone: +1 (714) 427-5220 | Phone: +1 (310) 393-7639 |
| Address 1: Honeywell Safety Products | Address 1: Shinano Kenshi Americas |
| Address 2: 3001 S. Susan Street | Address 2: 6065 Bristol Parkway |
| City, State, Zip: Santa Ana, CA 92704 USA | City, State, Zip: Culver City, CA 90230 USA |

Copy to:

| Honeywell | Supplier |
| --- | --- |
| Name: Joshua Foster | Name: Nick Lauro |
| Title: Vice President and General Counsel | Title: Vice President, Financing Office |
| Phone : (516) 577-2642 | Phone: +1 (310) 693-7604 |
| Address 1: Honeywell Industrial Safety | Address 1: Shinano Kenshi Corp. |
| Address 2:2 Corporate Center Drive | Address 2:6065 Bristol Parkway |
| City, State, Zip. Melville, NY 11747 | City, State, Zip: Culver City, CA 90630 USA |

24.3 The construction, interpretation, performance, and enforcement of this Agreement, all transactions hereunder and the parties relationship in connection therewith or any related claims whether founded in contract, tort or otherwise, will be governed by the laws of the State of New York, U.S.A. without regard to or application of its

principles or laws regarding conflicts of laws, and excluding the United Nations Convention on the International Sale of Goods of 1980 (and any amendments or successors thereto), and the federal or state courts in New York, New York will have exclusive jurisdiction of any dispute.

24.4    In the event Honeywell divests a subsidiary, division or business unit, Supplier will extend the right to purchase Products and services pursuant to this Agreement to such subsidiary, division or business unit for a period not to exceed 12 months from the date of divestiture under the terms of this Agreement.

24.5    If Honeywell acquires a company that is a customer of Supplier, Supplier will permit the termination, at Honeywell's option, of the acquired entity's agreement with Supplier without liability so that the products and services provided to the acquired entity may be provided pursuant to the terms, conditions, rates and charges contained in this Agreement between Honeywell and Supplier.

24.6    This Agreement has been negotiated at arms length between parties who are experienced and knowledgeable in the matters contained in this Agreement, and the parties hereby agree that any statute, law or common law principles or other authority that would require interpretation of any ambiguities in this Agreement against the party who has drafted it are not applicable and are hereby waived.

DocuSign Envelope ID: A3118D0C-9FC9-4B01-B5FB-05DB6D6BD659

The parties have executed this Agreement on the dates set forth below.

**HONEYWELL INTERNATIONAL INC.**                    **SUPPLIER**

By: _____                    By: _____

Name: _____                     Name: _____
Magalie Darfeuil                                  Jim Rideout

Title: ___SPS CPO_____                     Title: ___Western District Manager___

Date: ___10/9/2017_____                     Date: ___9/29/2017_____

**Exhibit A – Products, Minimum Stocking Level, Pricing, Lead-times and Specifications**

For delivery to: 1757 Carr Road, Calexico, CA 92231 for cross-border transshipment to Honeywell's location at Calle Electra #1099 Parque Industrial Maran, Mexicali, BC, 21385 Mexico:

| HON Part No. | Supplier Part No. | Description | UOM | Price | MOQ (Master Carton Multiple) | Minimum Inventory Quantity | Maximum Inventory Quantity | PO Lead Time (Week Days) | Min/Max Replenishment Lead Time (Week Days) |
|---|---|---|---|---|---|---|---|---|---|
| 50126420 | DRF-29312-033 | Air Pump Assembly | EA | $77.10 | 100 | 400 | 800 | 5 | 60 |
| | | | EA | | | | | | |
| | | | EA | | | | | | |

**Exhibit B – Stocking Program**

Supplier will monitor the stocked Products to ensure compliance with this **Exhibit B** and will adjust the number of stocked Products as necessary to comply with the terms of this **Exhibit B** and the Forecasts.

Honeywell will issue Purchase Orders to Supplier for the release of Products as required. Honeywell has no liability for stocked Products until Honeywell provides such Purchase Order.

Supplier will warehouse stocked Products at Supplier's facility. The minimum level of stocked Products to be warehoused by Supplier ("**Minimum Level**") is set forth on **Exhibit A**. Supplier must maintain at least the Minimum Level of stocked Products. Supplier will notify Honeywell weekly or on such other schedule as may be mutually agreed of the Honeywell part numbers, Honeywell Purchase Order numbers and quantity of Products warehoused at Supplier's facility.

Supplier will store stocked Products in such a way that they can be readily distinguished from other inventory and in a secure location, and as otherwise reasonably specified by Honeywell. Supplier bears the custodial risk of loss or damage to the stocked Products prior to their release, whether such loss be through fire, flood, tornado or other catastrophe. Supplier shall be responsible for all taxes on the Products prior to their release.

Upon termination of this Agreement by Honeywell for convenience, unless as the result of Epidemic Failure as defined in Section 16.6, Honeywell will purchase stocked Products custom-made to Honeywell's specifications up to the Maximum Level, including any Products in transit, and any non-cancellable, non-returnable materials exclusive to Honeywell and purchased in support of the Forecast.

## <u>Exhibit C – Quality Procedures and Product Certifications</u>

**Quality System and Quality Assurance Procedures:**

Q004 Quality Assurance Requirements for Suppliers



Q004.pdf

QA-PSW Part Submission Warrant for PPAP Level 3 required.



QA-PSW template
(Part Submit Warran

**Product Certifications:**

None required for these parts.

**Exhibit D – Tooling**

1. Supplier will not lease, assign, loan or sell any of the Tooling or any interest therein, without Honeywell's prior written consent. Supplier will keep the Tooling free and clear of all liens, claims, and encumbrances during the term of this Agreement. Supplier consents to the filing of a financing statement(s) by Honeywell indicating that the Tooling is bailed property of Honeywell.

2. Supplier will use the Tooling exclusively in connection with work performed for Honeywell. Supplier shall not copy, duplicate or use Tooling other than as directed in writing by the Honeywell. Supplier is solely responsible for (a) the installation of the Tooling and any and all devices necessary for the proper operation of the Tooling, and (b) training operators and others as necessary in the proper operation, use, application and maintenance of the Tooling.

3. For Tooling provided by Honeywell to Supplier: (a) Supplier accepts the Tooling "AS IS, WHERE IS"; (b) Honeywell makes no warranties, express or implied, with respect to the Tooling, and expressly disclaims all warranties, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE; and (c) to the extent permitted by the manufacturer, Honeywell assigns to Supplier during the term of this Agreement all of Honeywell's rights under applicable manufacturers' warranties with respect to the Tooling.

4. Supplier assumes full responsibility and risk of loss for the Tooling and its use. Supplier, at its expense, will keep the Tooling insured against all risks of direct physical loss for not less than its full insurable value. If Supplier fails to insure the tools, Supplier agrees that Honeywell may acquire insurance and recover the cost from any amounts owed by Honeywell to Supplier. Supplier will pay all fees, assessments and taxes imposed on the Tooling during the Term.

5. Supplier will notify Honeywell of any repair, replacement or renewal of the Tooling. Supplier, at its sole cost, will properly maintain the Tooling in good order and condition, save normal wear and tear, and repair or replace the Tooling as required. Supplier will comply with (a) all manufacturers' instructions regarding the Tooling and (b) Honeywell's Maintenance Checklist provided to Supplier from time to time. Supplier will not alter the Tooling nor affix or connect any accessory device to the Tooling, if such alteration or addition would impair or reduce the value of such Tooling or would impair the safe use, operation or application of the Tooling.

6. Honeywell may inspect the Tooling and observe its use. Supplier will not remove the Tooling from its premises without Honeywell's prior written approval. Any Tooling may be removed by Honeywell at any time, and Supplier will, at its cost, prepare the Tooling for transport and ship it to the location requested by Honeywell. Upon termination of this Agreement, at Honeywell's option, Supplier will, at its sole cost, prepare the Tooling for transport and ship it to the location requested by Honeywell. Upon termination of this Agreement, Honeywell may, in its discretion, without notice, liability or legal process, enter Supplier's premises and take possession of the Tooling.

7. Two sides of each piece of Tooling must be painted in red and each piece of Tooling must have an identification metal tag, affixed on the tool, containing the following information:

   **"HONEYWELL PROPERTY"**
   **Honeywell inventory number – "Serial Number"**
   **Tool number / Part number**
   **Model (part) name**
   **Production start date**
   All the jigs, fixtures, connecting ring, electrical connectors must be marked with a metal tag containing the following information:
   **"HONEYWELL PROPERTY"**
   **Tool number** (for which tool number it is used)

# Tooling Description

| | |
|---|---|
| (Honeywell)_____<br>TOOL INVENTORY (SERIAL )NUMBER | DATE ISSUED |
| | |
| TOOL NUMBER / PART NUMBER | PRODUCTION START DATE |
| | |
| MODEL ( PART ) NUMBER | DEPRECIATION QTY |
| | |

| TOOL NAME | QTY | TOOL COST | WEIGHT |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Attach 3" x 5" picture of tool in this area with identification tag shown.

DocuSign Envelope ID: A3118D0C-9FC9-4B01-B5FB-05DB6D6BD659

**Exhibit E**

**INTENTIONALLY OMITTED**

DocuSign Envelope ID: A3118D0C-9FC9-4B01-B5FB-05DB6D6BD659

## EXHIBIT F

## INTENTIONALLY OMITTED