UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHINANO KENSHI CORPORATION, and SHINANO KENSHI CO., LTD., | |
| Plaintiffs, | |
| - against - | Case No. 22 Civ. 3704 (LGS) |
| HONEYWELL INTERNATIONAL INC., | |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

DAVIS WRIGHT TREMAINE LLP
Mohammad B. Pathan
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
mohammadpathan@dwt.com

Spencer Persson (*pro hac vice*)
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
spencerpersson@dwt.com

*Attorneys for Plaintiffs Shinano Kenshi Corporation
and Shinano Kenshi Co., Ltd.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND........................................................................................3

ARGUMENT ...............................................................................................................5

I.      LEGAL STANDARD........................................................................................5

II.     THE COMPLAINT SHOULD NOT BE DISMISSED PURSUANT TO RULE
        12(B)(6)..............................................................................................................6

        a.      Shinano's First Cause of Action for Breach of Contract States a Valid Claim
                for Relief (Count 1)...............................................................................6

                i.      Honeywell Breached Section 2.3 of the SSA .............................6

                ii.     Honeywell Terminated the SSA ...................................................9

                iii.    Shinano is Entitled to Damages ................................................10

        b.      The SSA was Modified by the Parties (Count 2).................................10

        c.      The Breach of the Implied Covenant of Good Faith and Fair Dealing is Not
                Duplicative (Count 3) ........................................................................13

        d.      The Complaint States Valid Causes of Action for Fraud (Counts 4 and 5)...........14

        e.      The Complaint States a Valid Cause of Action for Negligent
                Misrepresentation (Count 6) ...............................................................15

        f.      Punitive Damages are Appropriate in this Case where Honeywell Sought to
                Profit Off of Taxpayers During a Global Pandemic. ............................17

CONCLUSION...........................................................................................................20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amusement Indus., Inc. v. Stern*,
786 F. Supp. 2d 758 (S.D.N.Y. 2011)...........................................................................16

*Annuity, Pension, Welfare & Apprenticeship Skill Improvement & Safety Funds,
Local 137 v. Colonial Sur. Co.*,
No. 11 Civ. 178 (NSR), 2014 WL 4493803 (S.D.N.Y. Sept. 11, 2014) ...................8

*Avant Cap. Partners LLC v. W108 Dev. LLC*,
No. 16 Civ. 3359 (LLS), 2016 WL 7377276 (S.D.N.Y. Dec. 9, 2016)....................14

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
778 F. Supp. 2d 375 (S.D.N.Y. 2011).........................................................................11

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
98 F.3d 13 (2d Cir. 1996).............................................................................................14

*Creative Waste Mgmt., Inc. v. Capitol Env't Servs., Inc.*,
429 F. Supp. 2d 582 (S.D.N.Y. 2006).........................................................................16

*Credit Agricole Corporate v. BDC Finance, LLC*,
135 A.D. 3d 561 (1st Dep't 2016) ...............................................................................13

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
375 F.3d 168 (2d Cir. 2004)...........................................................................................8

*Forman v. Guardian Life Ins. Co. of Am.*,
76 A.D.3d 886 (1st Dep't 2010) ..................................................................................13

*FPP, LLC v. Xaxis US, LLC*,
764 Fed. App'x 92 (2d Cir. 2019)................................................................................14

*In re NYSE Specialists Secs. Litig.*,
503 F.3d 89 (2d Cir. 2007)..........................................................................5, 8, 11, 12

*Ion Audio, LLC v. Bed, Bath & Beyond, Inc.*,
No. 15 Civ. 8292 (KMW), 2019 WL 1494398 (S.D.N.Y. April 2, 2019)..........10, 11

*John St. Leasehold LLC v. F.D.I.C.*,
196 F.3d 379 (2d Cir. 1999).........................................................................................11

*Kleinberg v. Radian Grp., Inc.*,
No. 01 Civ. 9295 (RMB)(GWG), 2002 WL 31422884 (S.D.N.Y. Oct. 29, 2002)................12

*Kreiss v. McCown De Leeuw & Co.*,
    37 F. Supp. 2d 294 (S.D.N.Y. 1999) ................................................................ 9

*Madison Cap. Co., LLC v. Alasia, LLC*,
    615 F. Supp. 2d 233 (S.D.N.Y. 2009) ............................................................. 17

*Naldi v. Grunberg*,
    80 A.D. 3d 1 (1st Dep't 2010) ........................................................................ 11

*Perks v. TD Bank, N.A.*,
    444 F. Supp. 3d 635 (S.D.N.Y. 2020) .............................................................. 7

*Process Am., Inc. v. Cynergy Holdings, LLC*,
    839 F.3d 125 (2d Cir. 2016) ........................................................................... 10

*Stevens v. Publicis, S.A.*,
    50 A.D. 3d 253 (1st Dep't 2008) .................................................................... 11

*Vitac Corp. v. Thomson Reuters (Mktg.) LLC*,
    170 A.D.3d 492 (1st Dep't 2019) ..................................................................... 8

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011) ............................................................................. 5

*World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*,
    345 F.3d 154 (2d Cir. 2003) ............................................................................. 8

**Rules**

Federal Rules of Civil Procedure
    Rule 12(b)(6) ................................................................................................ 1, 5, 6

Plaintiffs Shinano Kenshi Corporation and Shinano Kenshi Co., Ltd. (collectively, "Shinano")[1] submit this memorandum of law in opposition to the motion to dismiss the Complaint filed by Defendant Honeywell International Inc. ("Honeywell") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This case is about Honeywell's profiteering off of personal protection equipment ("PPE") during the COVID-19 pandemic and in the process taking advantage of taxpayers and subcontractors like Shinano. At the outset of the pandemic, Shinano answered the call when Honeywell chose to modify their Strategic Supplier Agreement ("SSA") for the production of the custom Shinano DRF-29312-033 blower products (the "ASPINA Blower"), the key component in Honeywell's Powered Air Purifying Respirator ("PAPR") unit. Honeywell claimed to have a direct line to President Trump, and that the U.S. Government was placing orders for as many PAPRs as Honeywell could produce. As it turns out, these were false statements, Honeywell over-ordered from Shinano and then refused to pay for $3 million in product, all while continuing to profit off of the pandemic and U.S. taxpayers through the production of other PPE.

Honeywell's motion to dismiss asks this Court to believe that it has only exercised a contractual right to "delay and suspend shipments," and therefore this case is much ado about nothing because Honeywell's refusal to pay for $3 million in products it ordered is simply a "right to payment" that has not "accrued." The facts Shinano has pled in the Complaint—corroborated by emails from Honeywell—show that Honeywell's conduct does not constitute a mere delay and suspension of shipment. Indeed, the shipment provision that Honeywell relies on in the SSA is titled "TIME IS OF THE ESSENCE," and the plain language of the provision shows that its

---

[1] Shinano respectfully adopts the abbreviations and definitions set forth in the Complaint (Dkt. No. 1).

purpose was to require Shinano to promptly ship completed products, not to allow Honeywell to perpetually and indefinitely delay shipment at tremendous cost to Shinano and to evade its payment obligations.

The Complaint shows that, on February 20, 2021, Honeywell purported to cancel $3 million worth of custom ASPINA Blowers more than six months after placing the orders, breaching the terms of the SSA.  Further, by cancelling all outstanding orders, Honeywell was terminating the SSA.  Honeywell could not simply terminate individual purchase orders at this stage because the purchase orders at issue were placed in July and could only be terminated within 30 days thereafter.  Upon termination, Honeywell was required to pay for the custom ASPINA Blowers, and it has not done so, breaching the SSA as set forth in Count 1 of the Complaint.  Accordingly, Honeywell owes Shinano $3 million.

Honeywell's other arguments fare no better.  Honeywell attacks Shinano's second breach of contract claim (Count 2) by arguing that the SSA could only be modified in writing, ignoring that the parties' email exchanges relating to the ASPINA Blower constitute a writing under New York law, and that it was Honeywell that initiated modifications to the SSA.

Honeywell argues that Shinano's breach of the covenant claim (Count 3) fails because it does not differ from the breach of contract claims, ignoring that the claim is premised on Honeywell's coercion to ramp up production on a low volume product by claiming to have the support of President Trump himself.  In reality, Honeywell either never had or overstated President Trump's support, never received the volume of U.S. Government orders that it represented or those orders were cancelled, and then hid these things from Shinano only to terminate the SSA and refuse to pay for approximately $3 million in ASPINA Blowers.  Indeed, by admitting its "wrongdoing"

on February 20, 2021, Honeywell expressly acknowledged its bad faith conduct and expanded the case beyond a simple breach of contract matter.

Nor are Shinano's fraud claims identical to the breach of contract claims.  Rather, the fraud claims relate to

- (Count 4) Honeywell's repeated false claims that it had a large commitment from the U.S. Government to purchase PPE, including the ASPINA Blower, causing Shinano to exponentially increase its production capabilities during a historically difficult manufacturing period as COVID made production worldwide exceedingly difficult.  This conduct also underlies Shinano's negligent misrepresentation claim (Count 6), but not, as Honeywell argues, Shinano's breach of contract claim; and,

- (Count 5) Honeywell's continued assurances that it would accept delivery of the units ordered over a period of several months—causing Shinano to continue incurring otherwise avoidable production and storage costs—even though Honeywell knew it did not and would not ever receive orders sufficient to sell the ASPINA Blowers that it had custom ordered.

In short, Honeywell's arguments on the motion to dismiss are misleading, both as to the contents of the SSA and as to what Shinano has pled.  Honeywell's motion to dismiss should be denied in full.

## FACTUAL BACKGROUND

Honeywell is a leading global provider of PPE.  Shinano, also known as ASPINA, is a leader in both manufacturing and hardware and software development.  Compl. ¶ 2.  In 2017, Shinano entered into the SSA with Honeywell to manufacture and produce the ASPINA Blower for use in Honeywell's PAPR unit.  *Id.* ¶ 2.  The PAPR unit is an individual breathing PPE device

originally intended for use in pharmaceutical development, manufacturing, construction, and hospital laboratory settings. *Id.* ¶¶ 2, 14-16. The ASPINA Blower is the essential operating part for the PAPR unit. *Id.* ¶¶ 2, 17-19.

At the outset of the COVID-19 pandemic, Honeywell proactively marketed these units to the U.S. government as a unique solution to protect frontline workers during the pandemic. *Id.* ¶¶ 3, 28-29. Honeywell exponentially increased its orders of ASPINA Blowers from 1,936 units in 2018 and 2019 to 112,000 units in the first few months of the pandemic. *Id.* ¶¶ 3, 30-32, 38-40. In short, Honeywell demanded that Shinano exponentially increase the scale of its operations and the parties understood and agreed that these orders were non-cancellable. *Id.* ¶¶ 32, 89. Based on this agreement, Shinano rapidly ramped up production to meet Honeywell's orders and provide PPE during the COVID-19 crisis. *Id.* ¶ 36.

After Shinano delivered approximately half of the ASPINA Blowers in August 2020, Honeywell began delaying shipment of the remaining ASPINA Blowers in contravention of the parties' agreed-upon shipment schedule. *Id.* ¶¶ 4, 48-60. Honeywell did not terminate the purchase orders (nor could it, although Shinano agreed to one good faith reduction of 6,000 units) and instead simply attempted to extend the delivery timeline from the third and fourth quarters of 2020 to the first half of 2021. *Id.* ¶¶ 4, 32, 48-60. Finally, after months of continued assurances and excuses for failing to accept delivery, including so-called balance sheet accommodations requested by Honeywell to push all deliveries into 2021, Honeywell cancelled the SSA in February 2021. *Id.* ¶¶ 4, 48-60, 67. Specifically, Honeywell informed Shinano that it would not accept delivery of or pay for the more than 35,000 completed custom units that Shinano was holding at Honeywell's request and would not pay for any portion of the 11,500 custom units in progress. *Id.* ¶¶ 4, 63, 67. Honeywell argued that Shinano should share in its losses on the PAPR unit production

because (a) the government unexpectedly cancelled orders of the PAPR units and/or (b) Honeywell had planned on selling many of the units outside of the United States, but the Trump Administration had unexpectedly prohibited U.S. companies from selling and exporting COVID-19 related PPE abroad.  *Id.*

Based on Honeywell's refusal to accept delivery and remit payment, Shinano is owed more than $3 million for the custom-produced ASPINA Blowers and was forced to file this lawsuit seeking recovery from Honeywell for breach of contract, breach of the implied covenant of good faith and fair dealing, for common law fraud, and for negligent misrepresentation.

Following pre-motion letter practice, *see* Dkt. Nos. 8, 14, this Court held a pre-motion conference on Honeywell's anticipated motion to dismiss and entered a scheduling order for the Parties' briefs.  *See* Dkt. No. 23.  On August 8, 2022, Honeywell filed a Motion to Dismiss seeking dismissal of each of Shinano's claims with prejudice.  *See* Dkt. No. 26, Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiffs' Complaint ("Mem.").  Shinano now opposes Honeywell's motion.

## ARGUMENT

## I.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).  In determining whether this standard is satisfied, courts "must accept all allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party's favor."  *In re NYSE Specialists Secs. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (Sotomayor, J.) (citation omitted).

## II.     THE COMPLAINT SHOULD NOT BE DISMISSED PURSUANT TO RULE 12(B)(6)

Honeywell moves to dismiss each of the Complaint's six causes of action pursuant to Rule 12(b)(6).  For the reasons explained below, these arguments are completely without merit.

### a.     Shinano's First Cause of Action for Breach of Contract States a Valid Claim for Relief (Count 1)

Shinano's first breach of contract claim advances two theories: first, that Honeywell breached the SSA by failing to terminate the Purchase Orders for the Outstanding Units within the agreed-upon time in § 2.3 of the SSA and consequently failing to accept delivery, and second, that Honeywell terminated the SSA and refused to pay for the Outstanding Products as it was required to do upon termination.  Honeywell seeks to dismiss this claim on three grounds.  First, Honeywell argues that it did not breach Section 2.3 of the SSA because it was permitted to terminate purchase orders within 30 days of shipment.  Second, Honeywell argues that it did not terminate the SSA.  Finally, Honeywell claims that Shinano "cannot recover damages because no right to payment has accrued."  As discussed below, each argument fails as a matter of law.

### i.     Honeywell Breached Section 2.3 of the SSA

Section 2.3 of the SSA provides that "Honeywell may terminate any Purchase Order without liability on the part of Honeywell upon 30 days' prior written notice."  Compl. Ex. A § 2.3. As a basis for dismissal, Honeywell contorts the provision to argue that the 30 days' prior written notice must be *based on the date of shipment*, citing to § 12.1 of the SSA.  Mem. at 7.  This language appears *nowhere* in the SSA, and the only rational interpretation of Section 2.3 is that Purchase Orders must be terminated within 30 days after Honeywell placed the order—in this instance, the orders were placed in July 2020 and Honeywell did not purport to cancel until February 2021.  Compl. Ex. A § 2.3; ¶¶ 39-41, 65-67.

6

Indeed, Honeywell's reliance on § 12.1 of the SSA is misplaced.  Section 12.1 pertains to Honeywell's insistence on prompt and timely delivery of units ("TIME IS OF THE ESSENCE"), and not, as Honeywell argues, Honeywell's unilateral right to delay orders in perpetuity to evade payment.  Compl. Ex. A § 12.1.  No reasonable person would interpret Section 12.1 in that way. Moreover, this is a case about termination of every purchase order under the SSA which in practical effect terminated the SSA as a whole and, therefore, § 12.1 is not at issue.[2]  As Honeywell concedes, "[c]ontractual claims *unambiguously* barred by an agreement between the parties may be determined on a motion to dismiss."  Mem. at 6 (emphasis added) (quoting *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 122 (2d Cir. 2022)); *see Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 639 (S.D.N.Y. 2020) ("On a motion to dismiss, the Court may dismiss a breach of contract claim for failure to state a claim if the 'plain language' of the contract contradicts or fails to support the plaintiff's allegations of breach.") (quoting *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 1568-58 (2d Cir. 2016)).  Here, there can be no reasonable dispute that (1) Section 2.3 only allowed termination of purchase orders within 30 days; and, (2) Section 12.1 relates to Shinano timely shipping product to Honeywell and is not a backdoor termination provision as Honeywell urges.  Compl. Ex. A §§ 2.3, 12.1.

But even if Honeywell were right, and there was some ambiguity relating to whether Section 2.3 required termination within 30 days of order placement or within 30 days of delivery (impossible given Honeywell's repeated delays on shipments starting in August 2020),

---

[2] Honeywell's attempt to invoke its cancellation of 12,000 units actually supports Shinano's interpretation of the termination provision.  Mem. at 7.  All 112,000 units ordered by Honeywell had been ordered no later than July 9, 2020.  Compl. ¶ 40.  Honeywell did not attempt to cancel the 12,000 units until more than 30 days later on August 31, 2020 (Compl. ¶¶ 49-50), and Shinano rejected this termination under the SSA but agreed to compromise and allow termination of 6,000 units instead.  Compl. ¶ 59.  If Honeywell had the unilateral right to cancel orders after 30 days, then it would have invoked that right in August 2020.  This also undermines Honeywell's arguments that the SSA was not modified over time via email, because Honeywell had no right to cancel custom orders but Shinano agreed in good faith to this modest reduction.  Compl. Ex. A § 2.4, ¶¶ 49, 53, 55, 59.  At a minimum, these are questions that cannot be resolved at the pleading stage.

Honeywell's motion would have to be denied. *See Annuity, Pension, Welfare & Apprenticeship Skill Improvement & Safety Funds, Local 137 v. Colonial Sur. Co.*, No. 11 Civ. 178 (NSR), 2014 WL 4493803, at *6 (S.D.N.Y. Sept. 11, 2014) (denying summary judgment because the contract's notice provision was ambiguous by failing to "otherwise define the point at which the thirty-day notice period begins to run"). Indeed, it is black-letter law that ambiguity as to the relevant terms of a contract warrant a denial of a motion to dismiss. *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) (noting that a motion to dismiss should be denied "if a contract is ambiguous as applied to a particular set of facts, [because] a court has insufficient data to dismiss a complaint for failure to state a claim."); *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co*., 345 F.3d 154, 184 (2d Cir. 2003) ("[A]mbiguity exists where a contract term 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'"); *see also Vitac Corp. v. Thomson Reuters (Mktg.) LLC*, 170 A.D.3d 492 (1st Dep't 2019) (reversing trial court dismissal of breach of contract claim where the notice and renewal provisions of the contract were ambiguous).

Drawing "all inferences in the light most favorable to the non-moving party's favor," this Court should, for purposes of Honeywell's motion to dismiss, read § 2.3 of the SSA as requiring Honeywell to cancel all Purchase Orders within 30 days of issuance, as alleged in the Complaint. *See NYSE Specialists Secs. Litig*, 503 F.3d at 95; Compl. Ex. A § 2.3, ¶¶ 22, 49, 77. The Complaint alleges that Honeywell failed to do so: by "early July [2020] … Honeywell had placed Purchase Orders with Shinano for 112,000 ASPINA Blower units" but Honeywell only affirmatively requested to cancel all Purchase Orders for the Outstanding Products in February 2021 (*i.e.*, more

8

than 200 days after issuance).   Compl. ¶ 40, 67.   Moreover, because "TIME IS OF THE ESSENCE" and Shinano was required to "maintain an on-time delivery performance of 100%," Shinano was "ready and willing to deliver within the applicable lead times" agreed to between the parties.   Compl. Ex. A § 12.1, ¶ 82.   Accordingly, because Honeywell failed to terminate the Purchase Orders within 30 days of issuance and "accept the Outstanding Products within the delivery schedules agreed to between the parties," Shinano properly states a breach of the SSA. Compl. ¶ 80.

**ii.      Honeywell Terminated the SSA**

Shinano maintains that after months of continued assurances and excuses for failing to accept delivery, Honeywell terminated the SSA in February 2021.   *See* Compl. ¶¶ 4, 48-60, 67. Specifically, Honeywell informed Shinano that it would not accept delivery of or pay for the more than 35,000 completed custom units that Shinano was holding at Honeywell's request and would not pay for any portion of the 11,500 custom units in progress.   *Id.*   Honeywell contends that it did not terminate the SSA because there was no notice of termination and that Honeywell merely exercised its right to change delivery schedules and suspend scheduled shipments. Mem at 7-8.

Honeywell's framing of events is contradicted by Honeywell's own communications, as set forth in detail in the Complaint.   On February 20, 2021, Honeywell expressed the clear intent to terminate all outstanding orders.   Compl. ¶¶ 65-67.   By terminating all orders and refusing to ever take delivery of ASPINA Blowers, Honeywell was terminating the SSA, which related exclusively to the ASPINA Blower.    Compl. ¶¶ 17-18, Ex. A §§ 2.3, 2.4.   As such, Honeywell was required to pay for all custom ASPINA Blowers under Sections 2.3 and 2.4 of the SSA.

At a minimum, Honeywell's motion raises issues of fact regarding its termination of the SSA, which is inappropriate on a motion to dismiss.   *See Kreiss v. McCown De Leeuw & Co.,* 37 F. Supp. 2d 294, 298 (S.D.N.Y. 1999) (denying the motion to dismiss where "the issue is one of

9

fact not properly resolved on a motion to dismiss").  Accordingly, whether Honeywell terminated or constructively terminated the SSA is, at the very least, a question of fact, which is inappropriate for disposition on a motion to dismiss.

### iii.   Shinano is Entitled to Damages

Finally, Honeywell constructs a strawman argument without citing any supporting case law, arguing that Shinano cannot recover any damages because (i) § 11.5 SSA provides for 75-days to make payment after "receipt of conforming Products or services" and (ii) "Honeywell has received no Products for which it has not paid."  Mem. at 8.  As alleged in the Complaint, "Shinano was ready and willing to deliver" the Outstanding Products "within the applicable lead times," but it was *Honeywell* that repeatedly refused to accept delivery of the products.  *See*, *e.g.*, Compl. ¶¶ 48, 53, 54, 56-62, 82, 94.  Indeed, by breaching sections 2.3 and 2.4 of the SSA, Shinano is entitled to damages for the breach as a matter of black letter law.  *See Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 142 (2d Cir. 2016) ("A non-breaching party 'is entitled, as a matter of law, to recover market value damages to the extent that they can be proven with reasonable certainty.'").[3]

### b.   The SSA was Modified by the Parties (Count 2)

Honeywell argues that Shinano's alternative claim for breach of contract must be dismissed because the parties' joint modifications to the SSA via "email communications and other correspondence" do not satisfy the SSA's requirement that any modification to the agreement must be in a writing signed by the parties.  Mem. at 15.  Contrary to the arguments raised by Honeywell, discussed *infra*, contracts may be modified through email communications even where the contract requires all modifications to be in writing signed by both parties.  In *Ion Audio, LLC v. Bed, Bath*

---

[3] Shinano concedes that under § 12.4 of the SSA, it is not entitled to the "$160,000 or more in storage costs" it asserts in the Complaint.

*& Beyond, Inc.*, No. 15 Civ. 8292 (KMW), 2019 WL 1494398 (S.D.N.Y. April 2, 2019), the contract at issue required all amendments to be "in writing and signed by both parties" and the Court was tasked with determining whether an "email exchange constitutes a modification in writing signed by both parties." *Id.* at *3. In finding in the affirmative, the Court noted that "[t]he emails were plainly in writing, and each email concluded with a signature block, containing the typed name and title of the representative from [defendant] and [plaintiff]." *Id. Ion Audio* is consistent with a wealth of New York law considering emails "writings" sufficient to amend the terms of a contract and to satisfy the statute of frauds. *See, e.g., Stevens v. Publicis, S.A.*, 50 A.D. 3d 253, 256 (1st Dep't 2008) (email constituted a "signed writing" sufficient to modify an agreement and also satisfied agreement's requirement that "any modification be signed by all parties"); *Naldi v. Grunberg*, 80 A.D. 3d 1, 4 (1st Dep't 2010) ("we reject defendant's argument that an e-mail can never constitute a writing that satisfies the statute of frauds."). Here, the Complaint adequately alleges that "the parties jointly agreed to modify the SSA" through their "email communications and other correspondence," Compl. ¶ 89, and this Court must "draw all inferences in the light most favorable to the non-moving party." *See NYSE Specialists Secs. Litig.*, 503 F.3d at 95.

None of the three cases relied upon by Honeywell compel a different conclusion. First, *John St. Leasehold LLC v. F.D.I.C.*, 196 F.3d 379, 382 (2d Cir. 1999), involved a plaintiff's attempt to introduce oral modifications to an agreement, which explicitly required all modifications to be in writing and signed by the parties. Shinano's Complaint does not allege any oral modifications to the SSA. Second, in *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 411-12 (S.D.N.Y. 2011), the issue raised was whether an alleged modification, which purportedly provided plaintiff standing to sue for breach of a depositary agreement, that was

signed only by the defendant, was effective when the contract required that amendments must be signed by both parties.  Importantly, the Court noted that even if the modification was signed by both parties, it did not bear any relevance to the issue at play: plaintiff's standing to sue.  In contrast, Shinano alleges that the parties *jointly modified* the SSA's provisions on several occasions, including pertaining to cancellation or termination of the purchase orders, a central issue to the parties' dispute.  Compl. ¶ 89.  To the extent there is any ambiguity in whether the modifications contained in the parties' email communications and correspondence were executed by both parties, any ambiguity must be resolved in favor of Shinano, the non-moving party.  *See NYSE Specialists Secs. Litig.*, 503 F.3d at 95.  Third, Honeywell's reliance on *Kleinberg v. Radian Grp., Inc.*,  No. 01 Civ. 9295 (RMB)(GWG), 2002 WL 31422884, at *2 - *5 (S.D.N.Y. Oct. 29, 2002), is also misplaced.  There, the plaintiff asserted that certain alleged modifications to his severance benefits would apply to a change-in-control at his employer, including: (i) verbal modifications to the agreement and (ii) an email from the plaintiff to his employer summarizing the terms of the alleged verbal modification without a corresponding email from the employer agreeing to the modifications.  Here, the Complaint does not allege that the parties verbally modified the SSA, but, instead, that the parties *jointly* modified the SSA in written communications.  Compl. ¶ 89.

Modifications to the SSA happened on at least two occasions, and on each occasion the modification was initiated by Honeywell.  The Complaint shows and Honeywell cannot dispute that it ordered 112,000 ASPINA Blowers, paid for approximately 60,000 of those units, and Shinano was expected to accept these orders all at once.  Compl. ¶¶ 40, 63.  The SSA, however, only contemplated Shinano's production of 400 to 800 units at a time.  Compl. Ex. A at Ex. A.  Plainly, Honeywell sought to modify the agreement relating to quantity through its email

communications and sought to modify the lead time for the products, and Shinano accepted these modifications.  Compl. ¶¶ 30-35.  Honeywell also sought to modify the agreement by terminating 12,000 units more than 30 days after placing its order.  Compl. ¶¶ 40, 49-50, 59.  While Shinano did not accept this modification in full, it did permit Honeywell to cancel 6,000 units instead.  Compl. ¶ 59.  This modification, again initiated by Honeywell, was also via email.

For any or all of these reasons, the Court should reject Honeywell's motion for dismissal of Count 2.

### c.    The Breach of the Implied Covenant of Good Faith and Fair Dealing is Not Duplicative (Count 3)

Honeywell also argues that Shinano's claim for breach of the implied covenant of good faith and fair dealing must be dismissed because it is duplicative.  Honeywell's argument fails as a matter of law.  The covenant of good faith and fair dealing "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *Forman v. Guardian Life Ins. Co. of Am.*, 76 A.D.3d 886, 888 (1st Dep't 2010) (citations omitted).

This is precisely what Shinano alleges in this case:  in addition to the explicit promises made to accept the Outstanding Products after coercing Shinano to exponentially increase its production in the face of COVID-19 by claiming to have a direct line to President Trump, Honeywell reneged on the deal in bad faith and sought for Shinano to "share the pain … [for] Honeywell's 'wrongdoing' in attempting to cancel the Purchase Orders for the Outstanding Products."  Compl. ¶¶ 31-34, 65-67, 100.  These allegations rest upon distinct and independent allegations from those for Shinano's claim for breach of contract, which pertain to Honeywell's failure to pay for custom products it ordered.  *See* Compl. ¶¶ 20-23, 77-81; *Credit Agricole Corporate v. BDC Finance, LLC*, 135 A.D. 3d 561, 561 (1st Dep't 2016) (affirming that the trial

court correctly found that claims were not duplicative where breach of contract and breach of the implied covenant of good faith and fair dealing were based upon sufficiently distinct allegations). Moreover, the mere fact that Shinano "incorporates by reference the allegations contained in the foregoing paragraphs" does not change the fact that its claim for breach of the implied covenant of good faith and fair dealing does indeed contain independent and distinct allegations from that of its breach of contract claims.[4]

For any or all of these reasons, the Court should reject Honeywell's motion for dismissal of Count 3.

### d.    The Complaint States Valid Causes of Action for Fraud (Counts 4 and 5)

Honeywell seeks dismissal of both of Shinano's fraud claims on the grounds that they are duplicative of Shinano's breach of contract claims for failing to (i) "demonstrate a legal duty separate from the duty to perform under the contract"; "(ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract"; and (iii) "seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."  Mem. at 12. (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)). Shinano concedes that its fraud claims do not assert a "legal duty separate from the duty to perform under the contract" or claim "seek special damages."  *See* Compl. ¶¶ 23-29.  Rather, Shinano's fraud claims are premised on fraudulent misrepresentations made by Honeywell "collateral or extraneous to the contract."  *Bridgestone/Firestone*, at 20.  "A fraud claim may be considered collateral to a contract if the contract, including its representations and warranties, does not address the factual bases of the fraud claim."  *FPP, LLC v. Xaxis US, LLC*, 764 Fed. App'x 92, 94 (2d Cir.

---

[4] Honeywell's reliance on *Avant Cap. Partners LLC v. W108 Dev. LLC*, No. 16 Civ. 3359 (LLS), 2016 WL 7377276, at *3 - *4 (S.D.N.Y. Dec. 9, 2016), is misplaced.  In that case, the Court did not dismiss plaintiff's claim for breach of the implied covenant of good faith and fair dealing solely because plaintiff incorporated the prior allegations in the complaint, but rather because the plaintiff failed to allege any facts distinct from its breach of contract claim.  *Id.*

2019).  Shinano's fraud claims clearly allege facts collateral to the contract:  it alleges that Honeywell misrepresented that it "had a commitment from the U.S. government" and then-President Trump to supply PAPR units.  Compl. ¶¶ 30-31, 105-111.  Shinano also alleges that Honeywell continued to assure Shinano that it would accept delivery of the units ordered for months even though it knew that either the U.S. Government had never placed the orders as originally represented or had subsequently cancelled the orders.  Compl. ¶¶ 30-31, 48-62, 121-128.

These representations are separate and apart from either party's obligations under the SSA, which does not cover or contemplate the extraordinary increases in demand or the expedited timing required by Honeywell.  Compl. Ex. A at Ex. A, ¶¶ 24-25, 30-31.  Nor was the SSA intended to provide PPE for the government during a global pandemic.  Compl. ¶¶ 30-34.  It logically follows that all of Honeywell's representations regarding Honeywell's government contract for PAPR units would be "collateral or extraneous" to the SSA.  *Id.*

For any or all of these reasons, the Court should reject Honeywell's motion for dismissal of Counts 4 and 5.

### e.     The Complaint States a Valid Cause of Action for Negligent Misrepresentation (Count 6)

Honeywell moves to dismiss Shinano's claim for negligent misrepresentation on two grounds.  First, Honeywell argues that there is no special relationship between Honeywell and Shinano sufficient to state a claim for negligent misrepresentation.  Second, Honeywell argues that Shinano's claim for negligent misrepresentation is duplicative of its breach of contract claims.  Both arguments fail as a matter of law.

First, Shinano has properly pled that a special relationship exists between Honeywell and Shinano.  Under New York law, a special relationship exists between the parties "where one party

possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Creative Waste Mgmt., Inc. v. Capitol Env't Servs., Inc.*, 429 F. Supp. 2d 582, 609 (S.D.N.Y. 2006) (citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). Shinano concedes that in ordinary arms-length transaction, a special relationship does not exist. *See*, *e.g.*, *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 781 (S.D.N.Y. 2011).

Here, the parties' relationship, as it evolved during COVID-19, was not an ordinary arms-length relationship. A special relationship emerged as Shinano took unprecedented business measures in reliance on Honeywell's long-standing government contacts and, in particular, its representations that it had a direct line to President Trump such that Shinano could trust it by increasing production of ASPINA Blowers from 1,000 units per year to 112,000 units in six months. Compl. ¶¶ 30-35, 37, 43. Honeywell expressly represented to Shinano that it was in a unique and close position with respect to then-President Trump and his administration, including Honeywell's CEO corresponding and meeting with President Trump in person to discuss the sales of PAPR units and other PPE. *See*, *e.g.*, Compl. ¶¶ 30-33. The Complaint further alleges that Honeywell had superior knowledge regarding the state of its commitment from the U.S. government for PAPR units—information that was not available to Shinano—and Honeywell knew that Shinano was relying upon Honeywell's assertions over several months that it needed 112,000 ASPINA Blowers to fulfill the government commitment. Compl. ¶¶ 30-35, 43, 44, 52, 136. Shinano neither alleges that it was part of these communications and meetings, nor that it had a special relationship with President Trump.

Shinano adequately alleges that it was relying upon Honeywell's express and repeated representations that it had a commitment from the U.S. government. *See*, *e.g.*, *id.* ¶¶ 32 (Shinano

agreeing to ramp up production meet commitment from U.S. government); 33 ("Shinano continued to confirm to Benson and Grigorow of Honeywell that the extraordinary measures being taken to meet Honeywell's demand were based on 'the commitment from the U.S. government.'"); 44 ("Honeywell repeatedly affirmed that the production was based on a commitment from the U.S. government."); 49 (noting that in reliance on Honeywell's assertions, Shinano had to "make firm non-cancellable commitments to our supply base and to the labor group."). Accordingly, Shinano properly alleges the existence of a special relationship between Honeywell and Shinano to state a cause of action for negligent misrepresentation.

Second, Shinano's negligent misrepresentation claim is not duplicative of its claims for breach of contract. Honeywell relies upon *Madison Cap. Co., LLC v. Alasia, LLC*, 615 F. Supp. 2d 233, 240 (S.D.N.Y. 2009), for the proposition that "[i]f the duty between the parties arose out of a contract, such that the contract required a correct representation, then any misrepresentation must be pled as a breach of contract, not as a tort claim for negligent misrepresentation." *Madison Capital* is inapposite. As discussed above and alleged in the Complaint, Shinano alleges that the duty arose not out of the SSA, but from Honeywell's superior knowledge of the state of its commitment from the U.S. government. Accordingly, the Court should summarily dismiss this argument.

For any or all of these reasons, the Court should reject Honeywell's motion for dismissal of Count 6.

### f. Punitive Damages are Appropriate in this Case where Honeywell Sought to Profit Off of Taxpayers During a Global Pandemic.

In its motion, Honeywell argues that even if Shinano's fraud claims persist, punitive damages are unavailable because Shinano "does not allege that Honeywell's conduct was aimed at or harmed the public." Mem. at 17. Not so.

Shinano alleges that "Honeywell has long had close ties to the U.S. government, with U.S. government sales comprising a significant portion of Honeywell's revenue." Compl. ¶ 1. Shinano further alleges that "[a]t the outset of the COVID-19 pandemic, Honeywell proactively marketed the PAPR unit to the U.S. government as a unique solution to protect frontline workers during the pandemic." Compl. ¶ 3. These sales practices "included Honeywell planning to increase production of N95 masks and PAPR units, among other items, and selling them to the U.S. Government at very profitable margins." Compl. ¶¶ 29, 34.

Indeed, Honeywell's CEO, Darius Adamczyk, was holding press conferences with President Trump at the very same time Honeywell was modifying the volume allowances of the SSA and demanding that Shinano produce tens of thousands of units rather than 400 to 800 every 60 days. Compl. ¶¶ 31, 30-34. Adamczyk later boasted about Honeywell's "ramp-up in production of" PPE during this time period, claiming that Honeywell "shipped millions of masks to state and local governments" and delivered "more than 225 million respirators and face masks in one month." Compl. ¶ 37. Meanwhile, "Honeywell's other business units struggled," incentivizing Honeywell "to capitalize on the sales of high margin PPE as part of the pandemic." Compl. ¶ 37.

Honeywell confirmed its plan to gouge the U.S. government and U.S. taxpayers in its dealings with Shinano and in modifying the production schedules under the SSA, stating that "*These are not normal demand nor general industrial use products.. These orders are for COVID business.. The more we produce, more can be sold*." Compl. ¶ 41 (emphasis added). By all accounts, Honeywell's plan worked, with the Wall Street Journal reporting that Honeywell's "sales of PPE equipment including N95 masks [were] its lone revenue bright spot" during 2020. Compl. ¶ 42. Meanwhile, Honeywell was asking its subcontractors like Shinano to take unprecedented

business risks, only to leave those subcontractors holding the bag when doing so suited Honeywell's profit margins, just like overcharging on PPE across the board left taxpayers rather than Honeywell responsible for paying for the impacts of the global pandemic.  Compl. ¶ 43.

Ultimately, "while Honeywell's sales of the PAPR unit may not have met its profiteering expectations during the pandemic, the New York Times reported that as of February 10, 2021, the two largest U.S. manufacturers of N95 masks, Honeywell and 3M, were producing 120 million masks per month combined."  Compl. ¶ 68.  In its 2021 annual report, Honeywell reported that it invested about "$300 million in new mask production capacity globally."  Compl. ¶ 68.  Around the same time, news reports "noted that 'the U.S. government has ordered Honeywell International to expand its production of N95 masks in the country, so that masks are available for the general public also.'"  Compl. ¶ 68.

No doubt, Honeywell is gouging the public just like it gouged the U.S. government and taxpayers, and just like it cheated Shinano out of $3 million.  Thus, and contrary to Honeywell's assertion, the Complaint most certainly does "allege that Honeywell's conduct was aimed at or harmed the public," and discovery will further expose Honeywell's unrepentant profiteering off of PPE.  Mem. at 17.  Honeywell's bad faith and malicious conduct—or, as Honeywell executive Alban Gousset called it, a "wrongdoing"—has impacted Shinano, impacted taxpayers, and will continue to impact the public at large.  This is a pattern of conduct by Honeywell to place its profits above all else, and Honeywell is willing to step on its subcontractors, taxpayers, and the general public to make those exorbitant profits.  Honeywell's claim that "[a]t Honeywell, we have a responsibility to conduct ourselves with the highest levels of integrity in everything we do" is laughable, and it should be punished through punitive damages for taking advantage of Shinano

and taking advantage of the public trust in what is supposed to be a great American company. Compl. ¶ 1.

## CONCLUSION

For the foregoing reasons, Shinano respectfully requests that the Court deny Honeywell's motion in its entirety.

Dated: New York, New York
         August 29, 2022                    DAVIS WRIGHT TREMAINE LLP

                                            By: _____
                                                 Spencer Persson (*pro hac vice*)
                                            865 South Figueroa Street, 24th Floor
                                            Los Angeles, California 90017-2566
                                            Telephone: (213) 633-6800
                                            spencerpersson@dwt.com

                                            Mohammad B. Pathan
                                            1251 Avenue of the Americas, 21st Floor
                                            New York, New York 10020
                                            Telephone: (212) 603-6414
                                            mohammadpathan@dwt.com

                                            *Attorneys for Plaintiffs Shinano Kenshi*
                                            *Corporation and Shinano Kenshi Co., Ltd.*