

Suite 2400
865 South Figueroa Street
Los Angeles, CA 90017-2566

**Spencer Persson, Partner**
(213) 633-6800 tel
spencerpersson@dwt.com

March 21, 2023

**VIA ECF**
The Honorable Lorna G. Schofield
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Re:   *Shinano Kenshi Corp. et al. v. Honeywell Int'l Inc.*, Case No. 22 CV 3704 (LGS)

Dear Judge Schofield:

      Pursuant to the Court's Order dated March 9, 2023 (Dkt. No. 51) ("Order"), Plaintiffs ASPINA Incorporated (formerly known as Shinano Kenshi Corporation) and Shinano Kenshi Co., Ltd. (collectively, "Plaintiffs") respectfully submit this letter to the Court requesting that Plaintiffs be given leave pursuant to Fed. R. Civ. P. 15(a)(2) to amend their Complaint as described herein. The Order currently permits Plaintiffs to file "an Amended Complaint, solely for the purpose of repleading the breach of contract claim."  Dkt. No. 51 at 16.

      Plaintiffs have complied with the Order simultaneous with the filing of this letter-motion and filed a First Amended Complaint. Plaintiffs' revisions in the filed First Amended Complaint include elements not contemplated by the Order but which reflect that this Court failed to consider or otherwise construe material terms included in sections 2.3 and 12.1 of the Strategic Supply Agreement (the "SSA"). As discussed below, the revisions to the First Amended Complaint are consistent with New York authority because they construe all of the material terms in sections 2.3 and 12.1, and in a manner that states a claim for relief that is plausible on its face.

      Additionally, attached to this letter is a [Proposed] Second Amended Complaint which includes many previously unpled facts uncovered during the first six months of discovery. These facts have been assembled through depositions and document productions, and all of these facts support the proposed amendments to Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing and fraud. Plaintiffs must be given leave to replead those claims, as set forth below and reflected in the [Proposed] Seconded Amended Complaint attached hereto as Exhibit A.

**I.   Legal Standard**

      Rule 15(a) provides that "leave [to amend] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2); *see* 3 Moore, Federal Practice (2d ed. 1948); *Foman v. Davis*, 371 U.S. 178, 181–82 (1962) (except under certain circumstances, district courts should allow amendment to correct pleading deficiencies); *Hemphill v. Schott*, 141 F.3d 412, 420 (2d Cir. 1998) (same). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman*, 371 U.S. at 182.

"In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Id.* In reviewing a proposed amended complaint, "a court must review whether an amendment adds any new facts, accepted as true, that state a claim for relief that is plausible on its face." *Morales v. New York Univ.*, 585 F. Supp. 3d 610, 613 (S.D.N.Y. 2022) (internal quotations omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

"On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiffs' favor and against the defendants." *Hubbell Inc. v. Pass & Seymour, Inc*., 883 F. Supp. 955, 958 (S.D.N.Y. 1995); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989).

Here, Plaintiffs have not previously amended the operative pleading or caused any undue delay. Indeed, this Court only just ruled on Honeywell's motion to dismiss despite the fact that the motion had been fully briefed for six months, giving the parties ample time to conduct discovery. Unfortunately, however, the Court did not give Plaintiffs a chance to be heard prior to issuing its Order. Had it done so, Plaintiffs could have informed the Court of the many facts learned in discovery that support Plaintiffs' amended claims. Plaintiffs therefore request that this opportunity be accorded to them now through leave to file the [Proposed] Second Amended Complaint, which states claims plausible on their face and based on matters learned in discovery, particularly when construed in Plaintiffs' favor.

## II. Plaintiffs' Contract Claim Should Not Be Narrowly Restricted through a Reading of the SSA Most Favorable to Honeywell

A court is required to "give full meaning and effect to all of [the contract's] provisions." *Katel Ltd. Liab. Co. v. AT & T Corp*., 607 F.3d 60, 64 (2d Cir. 2010); *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015); *United States ex rel. Mathusek Inc. v. J. Kokolakis Contr., Inc*., 2007 U.S. Dist. LEXIS 44567, at *11 (S.D.N.Y. June 19, 2007) (a contract "should be construed so as to give full meaning and effect to all of its provisions") (internal quotation marks and citations omitted). "In construing a contract, a court should read the contract as a whole and ***avoid any interpretation that would render a contractual provision without force and effect***." *Luitpold Pharms., Inc*., 784 F.3d at 87 (emphasis added).

"[W]hen the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal" on a Rule 12(b)(6) motion. *Crowley v. VisionMaker, LLC,* 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007) (internal quotations omitted); *Wurtsbaugh v. Banc of Am. Sec. LLC*, 2006 WL 1683416 at *5 (S.D.N.Y. June 20, 2006) ("Where a contract term is ambiguous and material to the breach of contract claim, the claim may not be dismissed for failure to state a claim."). An ambiguous contract raises a question of fact as to the parties' mutual intent, which should be resolved by the trier of fact. *Pegler v. NRG Residential Solar Sols. LLC*, 2018 WL 1033232, at *2 (S.D.N.Y. Feb. 20, 2018); *see also Psenicska v. Twentieth Century Fox Film Corp.,* 2008 WL 4185752 at *4 (S.D.N.Y. Sept. 3, 2008) ("Where there are alternative, reasonable interpretations of a contract term rendering it ambiguous, the issue

should be submitted to the trier of fact and is not suitable for disposition on a motion to dismiss."). Moreover, "while a court is not obliged to accept the allegations of the complaint as to how to construe a contract, it should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss." *Maniolos v. United States,* 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir. 2012) (internal quotations omitted); *see also Gerritsen v. Glob Trading, Inc.,* No. 06–CV–3756, 2009 WL 262057 at *4 (E.D.N.Y. Feb. 4, 2009) ("Where, as here, a court is determining whether a plaintiff has adequately stated a cause of action for breach of contract, all contractual ambiguities should be resolved in favor of the plaintiff.").

Here, in failing to consider or interpret material terms included in sections 2.3 and 12.1, the Court impermissibly construed the SSA in a light most favorable to Honeywell rather than Plaintiffs. Specifically, this Court ignored that section 2.3 as pertaining to purchase orders states, in full, that "Honeywell may terminate any Purchase Order without liability on the part of Honeywell ***upon 30 days' prior written notice***." (SSA § 2.3 (emphasis added).) This Court failed to attribute any meaning to "upon 30 days' prior written notice" when it stated that "the provision for termination of a purchase order results in no liability to Defendant for products that are not yet delivered or completed." (Order at 6.) Not so. New York precedent shows that the best and most reasonable interpretation of this prenotification notice provision is that Honeywell would only escape liability for any performance concluded more than 30 days following termination of the purchase orders.[1] Here, the purchase orders produced in discovery show that every product ordered by Honeywell was to be delivered on or before December 19, 2020, and therefore Honeywell was fully liable for all orders at the time of any alleged termination of purchase orders by Honeywell on February 19, 2021.

Any other interpretation of this prenotification notice provision would render null the "upon 30 days' prior written notice" portion of section 2.3, in violation of New York principles of contract construction. Honeywell's former Senior Director Strategic Sourcing – PPE Division, Alban Gousset, acknowledged Plaintiffs' interpretation when he testified that Plaintiffs were to provide Honeywell with the "consequences of [] cancellation" if purchase orders were terminated or cancelled.[2] Gousset would know; he was the Honeywell executive who told Plaintiffs to provide a cancellation charge and scrap all remaining units. This is also consistent with section 2.4 which expressly applies to "custom Products that are within lead time under ***the terminated Purchase Order(s)***." (SSA § 2.4 (emphasis added).) Section 2.3 must be read in conjunction with section

---

[1] For example, if an employee could only be terminated upon 30 days' notice, that employee would have to be paid for all past work and for the next 30 days following the date of notice. *Hess v. Kanoski & Assocs.*, 668 F.3d 446 (7th Cir. 2012) (an employer's breach of 30-day pretermination notice provision requires it to pay the employee whatever compensation he was due during that time); *Vardi v. Mutual Life Ins. Co. of New York*, 136 A.D.2d 453, 523 N.Y.S.2d 95 (1st Dep't 1988) ("The contractual provision, giving plaintiff the right to thirty days' notice in the event of termination without cause, is clearly an express limitation of an employer's right to terminate employment at any time."). Similarly, a 30 days' notice provision in a business relationship means that business continues as usual for the ensuing 30 days and not that the relationship terminates immediately with the terminated party left entirely without compensation or remedy. *Rockland Exposition, Inc. v. Alliance of Automotive Service Providers of New Jersey*, 706 F.Supp.2d 350, 356 (S.D.N.Y. 2009) (holding that an immediate termination notice under a business contract was effective under the "erroneous date" rule but was not effective until the 45-day pretermination notice period had elapsed).

[2] To avoid duplication, Plaintiffs have omitted the associated exhibits to Exhibits A and B, as those were filed by Plaintiffs with the redacted versions of those documents filed simultaneously herewith pursuant to Rule I(D)(3) of Your Honor's Individual Rules and Procedures for Civil Cases.

3

2.4, and all products ordered via the purchase orders were requested for delivery by no later than December 19, 2020, more than two months prior to the date that Honeywell requested that Plaintiffs calculate a cancellation fee and scrap all units.  At a minimum, any construction of the 30 days' notice provision is ambiguous and must be construed at this stage in favor of Plaintiffs.

Honeywell's former employee Alex Grigorow also confirmed that Honeywell takes ownership and is liable for products once Honeywell issued a purchase order for the ASPINA Blower units.  Grigorow further testified that when Honeywell issues a purchase order it expects its "suppliers to rely on the purchase order and start making product."  Gousset agreed, testifying that when Honeywell issued a purchase order, it expected the supplier to produce the items ordered.  Gousset further testified that when Honeywell issued a purchase order, he would "expect that Honeywell would pay for the item being purchased."  Again, these interpretations are consistent with reasonably construing the "upon 30 days' prior written notice" portion of section 2.3 rather than ignoring that provision as this Court did in its Order.

The construction that Honeywell is liable for products ordered pursuant to purchase orders is also consistent with Exhibit B to the SSA, which states that "Honeywell has no liability for stocked Products ***until Honeywell provides such Purchase Order***."  (SSA, Exhibit B (emphasis added).)  Exhibit B does not say, as the Court incorrectly found, that Honeywell has no liability "for products that are not yet delivered or completed."  (Order at 6.)

This Court also ignored or otherwise failed to attribute meaning to the word "temporarily" in section 12.1 of the SSA.  In full, the sentence at issue states that "Honeywell reserves the right to change delivery schedules and ***temporarily suspend scheduled shipments***, beyond the replenishment lead time of 5 business days."  (SSA § 12.1 (emphasis added).)  Honeywell cannot be seen to have "temporarily" suspended shipments where it requested that Plaintiffs scrap all parts.  Moreover, and as Gousset testified, "temporarily suspending scheduled shipments" does not "mean suspending shipments for two years."  Indeed, District Judge Jed S. Rakoff has previously interpreted a nearly identical provision and rejected any interpretation that would allow a party to circumvent termination or cancellation clauses in the contract by deferring delivery in perpetuity.  *Kolmar v. Koch Supply & Trading, LP*, 2011 WL 6382566, \*8 (S.D.N.Y. 2011).  In short, by failing to recognize the word "temporarily," this Court ignored a material term and interpreted the SSA in a manner most favorable to Honeywell.

Accordingly, the contract claim as set forth in the filed First Amended Complaint and [Proposed] Second Amended Complaint should be allowed to proceed as is because it gives full meaning and effect to all of the SSA's provisions and material terms while according them their reasonable meaning.

### III.     Plaintiffs Should Be Given Leave to Amend Its Implied Covenant and Fraud Claims

Plaintiffs further seek leave of Court to replead their claims for breach of the implied covenant of good faith and fair dealing and fraud.  Having engaged in more than six months of discovery, exchanged tens of thousands of pages of documents, and conducted the depositions of three key Honeywell employees, Plaintiffs are well suited to address any pleading deficiencies identified in the Order.

4

### A.     Breach of the Implied Covenant of Good Faith and Fair Dealing

The covenant of good faith and fair dealing "embraces the pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Forman v. Guardian Life Ins. Co. of Am.*, 76 A.D.3d 886, 888 (1st Dep't 2010) (citations omitted).

In dismissing Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing for refusing to accept delivery of the remaining ASPINA Blowers, this Court held that the claim is "dismissed because it is inconsistent with the express terms of the Agreement." (Order at 9.) Specifically, the Court noted that under section 12.1 of the SSA, Honeywell was permitted to "change delivery schedules and temporarily suspend scheduled shipments" and that under section 2.4 the risk of loss was allocated to Plaintiffs for all past work and work to be completed over the ensuing 30 days for cancelled purchase orders. (Order at 10.) Again, and as stated above, Plaintiffs respectfully request leave to replead as the Court's analysis fails to "give full meaning and effect to all of [the contract's] provisions" in concluding that Plaintiffs' claim attempts to "override the express terms of the parties' Agreement." *Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010); Order at 10.

First, in falsely representing that it had a commitment from the U.S. Government for the purchase of 109,600 PAPR units when the government only issued to Honeywell a purchase order for ▮▮▮▮ units, Honeywell effectively deprived Plaintiffs of their contractual right under section 3.2 to reject a "Purchase Order within 2 business days of receipt." (SSA § 3.2.) This Court expressly recognized this provision in the Order (Order at 9) but ignored that Plaintiffs could not meaningfully exercise this right where Honeywell misrepresented demand for the PAPR units. Had Plaintiffs known the truth—that the U.S. Government only committed to purchase ▮▮▮▮ units rather than 109,600 units—Plaintiffs could have exercised this contractual right and declined to take the unprecedented business measures and risks that they took in increasing the production of ASPINA Blowers from 1,936 units across 2018 and 2019 to the production of 109,600 units across six months in a global pandemic. Honeywell's false representations breached the implied covenant of good faith and fair dealing by depriving Plaintiffs of information that would have allowed them to exercise their rights under section 3.2.

Second, by refusing to accept delivery and pay for the ASPINA Blowers while continuing to assure Plaintiffs that it would accept delivery up to and including through February 1, 2021, Honeywell deprived Plaintiffs of their contractual rights under sections 2.3 and 2.4. Specifically, Honeywell declined to pay for "custom Products that are within the lead time under the terminated Purchase Order(s), unique raw materials, work in progress and finished Products" as required under sections 2.3 and 2.4, and refused to accept delivery of those products under section 2.4. (SSA §§ 2.3, 2.4.) Honeywell issued seven purchase orders for the ASPINA Blowers from March 20 to May 13, 2020, totaling 109,600 units. All of those units were to be delivered under the express terms of the purchase orders from April to December 19, 2020. By refusing delivery where the lead time following completion is contractually intended to be five days while assuring Plaintiffs that it would accept delivery and pay for the products for over six months which would trigger payment under sections 2.3 and 2.4, Honeywell again breached the implied covenant of good faith and fair dealing and deprived Plaintiffs of their rights under the SSA.

5

Third, and to the extent that Honeywell is contending that no payment is due because Honeywell has simply "temporarily suspend[ed] scheduled shipments under § 12.1," Honeywell has deprived Plaintiffs of their contractual rights under this very same "TIME IS OF THE ESSENCE" provision. (SSA § 12.1.) Refusing to accept delivery for more than two years is not a "temporary" suspension of shipments. To construe "temporarily" in this manner is in bad faith and contrary to the plain language and meaning of section 12.1. Indeed, whether this provision even applies beyond the Stocking Program was questioned by Grigorow in his deposition, and Gousset testified that "temporarily suspending scheduled shipments" does not "mean suspending shipments for two years."

Moreover, reading the SSA in a manner that permits Honeywell to indefinitely suspend shipments renders sections 2.3, 2.4, and 12.1 null and void. *See Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) ("[i]n construing a contract, a court should read the contract as a whole and avoid any interpretation that would render a contractual provision without force and effect."). The court in *Kolmar Americas, Inc. v. Koch Supply & Trading, LP*, concluded that a contractual provision, similar to Section 12.1 here, which allowed the buyer to change delivery schedules and temporarily suspend shipments, did not alter the determination that time is of the essence; the Court pointed to seller's argument that "[t]o interpret the Contract as granting [buyer] the absolute right to defer deliveries would render the delivery windows and the cancellation clause meaningless, and violate a fundamental principle of contract law." 2011 WL 6382566, at *8 (citing to *United States ex rel. Mathusek Inc. v. J. Kokolakis Contr., Inc*., 2007 U.S. Dist. LEXIS 44567, at *11 (S.D.N.Y. June 19, 2007) (stating that a contract "should be construed so as to give full meaning and effect to all of its provisions") (internal quotation marks and citations omitted)). The same holds true here. Allowing Honeywell to suspend shipment in perpetuity would render sections 2.3 and 2.4 of the SSA meaningless, in violation of New York law. As such, the Court should grant Plaintiffs leave to replead its claim for breach of the implied covenant of good faith and fair dealing.

**B. Fraud**

**1. Fraud Claim Based on Honeywell's False Representations That It Had Procured Government Orders for 109,600 PAPR Units.**

In the Order, this Court dismissed the fraud claim regarding government orders for PAPR units because the representations regarding a firm commitment of the government to purchase 109,600 units "is not collateral to the Agreement and is defeated by its integration clause." (Order at 13.) As a result, this Court held that the SSA's "integration clause and its express reservation of Defendant's right to make non-binding predictions of its needs are enough to preclude any claim for fraud." (Order at 14.)

Again, in so holding, this Court has interpreted the parties' dealings in the light most favorable to Honeywell. As the Court noted, section 6.2 of the SSA states that "Forecasts are not purchasing commitments and do not bind or obligate Honeywell in any way." (Order at 12, quoting SSA § 6.2.) But Honeywell did not present the orders of 109,600 units as a mere "written forecast." (SSA § 6.2.) Nor can this Court conflate a "written forecast" with a "purchase order." Both terms appear in the SSA and cannot be given the same meaning.

6

Rather, Honeywell told Plaintiffs that it had a firm commitment for 109,600 PAPR units and issued purchase orders to Plaintiffs for that quantity. Honeywell's former employee Grigorow confirmed that Honeywell takes ownership and is liable for products once Honeywell issued a purchase order for the ASPINA Blower units. Grigorow further testified that when Honeywell issues a purchase order it expects its "suppliers to rely on the purchase order and start making product." Gousset agreed, testifying that when Honeywell issued a purchase order, it expected the supplier to produce the items ordered. Gousset further testified that when Honeywell issued a purchase order, he would "expect that Honeywell would pay for the item being purchased."

Thus, the issuance of a purchase order is not a mere forecast and cannot be interpreted as such by this Court. Indeed, in a separate portion of the Order this Court seems to recognize that purchase orders are not forecasts when it said that section 6.2 applies to "orders not yet placed." (Order at 12.) Any reading to the contrary is in favor of Honeywell, which is not permitted at this stage of the litigation. Indeed, Grigorow and Gousset's testimony makes this a question of fact for the jury.

With respect to the integration clause under section 24.1, the only product quantities included in the SSA are under the Stocking Program, capped at 800 units. (SSA, Exhibit A.) As such, the notion that Honeywell's purchase orders for 109,600 units falls within what was contemplated by the SSA—or that section 24.1 bars consideration of the fact of those purchase orders and negotiations relating thereto—reads the SSA in the light most favorable to Honeywell. The only reason Honeywell was able to obtain Plaintiffs' agreement to produce these units was by falsely claiming that it had a firm commitment from the U.S. Government for 109,600 units when it only received one government order for ▓▓▓▓ units. If Plaintiffs had known that Honeywell did not have a firm commitment and/or contract for sale of the PAPR units with the U.S. Government, they would not have manufactured and stored the Outstanding Products. Plaintiffs simply would have not taken the unprecedented business measures and risks in increasing the production of ASPINA Blowers from 1,936 units across 2018 and 2019 to the production of 109,600 units across six months in a global pandemic and would have avoided these risks by exercising its rights under section 3.2 to "reject such Purchase Order within 2 business days of receipt" if the "delivery quantity exceeds the Minimum Stocking Level." (SSA § 3.2.)

In short, the Court's observation that the forecast provision and integration clause somehow bar claims based on Honeywell's fraudulent representations of 109,600 is incorrect. The SSA does not contemplate the quantities that Honeywell ultimately ordered and Honeywell's employees testified that, contrary to this Court's ruling, purchase orders are not "forecasts."

### 2.     Honeywell's False Assurances That It Would Accept Delivery.

With respect to Plaintiffs' fraud claim relating to Honeywell's false assurances that it would accept delivery over eight months, this Court found that these false assurances were not false and, in any case, were permitted under section 12.1 whereby Honeywell could "change and postpone shipments." (SSA § 12.1.) As outlined in detail above, this reading ignores the word "temporarily," ignores that section 12.1 is titled "TIME IS OF THE ESSENCE," and ignores that a contemplated lead time of five days cannot be reasonably interpreted as months and years. It also ignores the testimony of Gousset who testified that Honeywell knew by July 2020 that demand for the PAPR units was not going to approach the 109,600 units ordered from Plaintiffs. Gousset

further testified that this information was not conveyed to Plaintiffs because the sales and marketing team withheld that information. Indeed, Gousset testified that "Honeywell should have told its suppliers when it started to learn the demand would be less" during this summer period but did not do so even though sales and marketing "knew that demand had cratered" by the summer.

Thus, this Court's suggestion that Honeywell did not cancel until February but still wanted the units from September through January and, therefore, the fraud claim cannot proceed both construes the SSA in the light most favorable to Honeywell and usurps the role of the jury. (Order at 11-12, "in September and October [Honeywell] reaffirmed that it still wanted the units, in December requested to hold further shipments, in January 2021 requested that some of the units be shipped between January and June of that year, but in February cancelled all outstanding orders.") Gousset testified that this Court's suppositions of Honeywell's intentions were simply not true, and Honeywell's continued assurances caused Plaintiffs to suffer damages that it would not have otherwise incurred, including storage costs. Plaintiffs must be allowed to amend.

### C. This Court's Suggestions Regarding Settlement.

During the first case management conference in this matter, this Court stated that this is the type of case that ought to settle, particularly given that the breach of contract claim was likely to move forward. The same suggestion is found in this Court's Order. Plaintiffs made the last two demands in this matter and did so in good faith. These good faith efforts were not reciprocated.

### IV. Conclusion

For the foregoing reasons, Plaintiffs respectfully request leave to file the attached [Proposed] Second Amended Complaint. This Court's Order denying leave failed to construe material terms of the SSA and construed other terms in the light most favorable to Honeywell. Moreover, Plaintiffs have obtained significant information in discovery that bolsters their claims. Plaintiffs should be allowed to amend, particularly where no prior amendment has occurred and where Plaintiffs were not granted a hearing on the motion to dismiss. By failing to permit the filing of this pleading, this Court would be construing the SSA in a light most favorable to Honeywell while ignoring material terms and evidence obtained in discovery.

Respectfully Submitted,

DAVIS WRIGHT TREMAINE LLP

By: */s/ Spencer Persson*  
Spencer Persson (*pro hac vice*)  
865 South Figueroa Street, 24th Floor  
Los Angeles, California 90017-2566  
Tel: (213) 633-6800  
spencerpersson@dwt.com  

Mohammad B. Pathan  
Kimberly Saindon  
1251 Avenue of the Americas, 21st Floor  
New York, New York 10020-1104  
Tel: (212) 489-8230  
mohammadpathan@dwt.com  
kimsaindon@dwt.com  
*Counsel for Plaintiffs Shinano Kenshi Corporation and Shinano Kenshi Co., Ltd.*